E-FILED
Monday, 09 September, 2024  04:48:27 PM
Clerk, U.S. District Court, ILCD





**UGS DRILLING CHIREN DZZD**

**and**

**MEADS-MAES USA CHIREN JOINT VENTURE COMPANY**

**Contract Number**   *000058*

**LUMP SUM TURN KEY (LSTK) INTEGRATED
PROJECT MANAGEMENT CONTRACT**

**FOR**

**DRILLING 13 UGS WELLS (TEN NEW EXPLOITATION
WELLS AND THREE OBSERVATION WELLS) &
ASSOCIATED SERVICES**

**REGARDING**

**CHIREN UNDERGROUND**

**GAS STORAGE EXPANSION PROJECT**

**THIS LUMP SUM TURN KEY INTEGRATED PROJECT MANAGEMENT CONTRACT FOR
DRILLING 13 UGS WELLS AND ALL ASSOCIATED SERVICES REGARDING CHIREN
UNDERGROUND GAS STORAGE EXPANSION PROJECT ("LSTK CONTRACT" or
"CONTRACT") is signed on 24/11/2023**

**BY and BETWEEN**

1. **UGS Drilling Chiren DZZD,** created and validly existing under the laws of Bulgaria,
   having its principal office at Str. Damyanitsa 3-5, City of Sofia, Post Code 1619,
   Bulgaria, BULSTAT 180918644 (hereinafter referred as **"Company"** or **"UGS
   Drilling Chiren DZZD"** which shall, unless the context requires otherwise, include
   its successors and permitted assigns) of the one part.

   and

2. **MEADS-MAES USA CHIREN JOINT VENTURE COMPANY,** created and validly
   existing under the laws of Bulgaria, having its principal office at: 3 Ogneborets St.,
   City of Sofia, Post Code 1619, Bulgaria, BULSTAT: 181043220 (hereinafter referred
   to as the **"Contractor"** or **"MM USA CJV"**, which, unless the context requires
   otherwise, shall include its successors, and permitted assignees).

**RECITALS**

PLAINTIFF'S
EXHIBIT

**1**



**Whereas:**

**A.** The Company is the main contractor who was awarded with Chiren Underground Gas Storage Expansion Project (**"Project"**) and has signed a contract (**"Main Contract"**) with Bulgartransgaz EAD (**"Employer"**);

**B.** Company requires Contractor to perform the Work and wishes to retain its services as explained and defined in this Contract in detail;

**C.** The Contractor represents that it is fully experienced, technically qualified, capable and willing to execute the Work subject to and in accordance with the documents referred to herein.

**D.** It is essential to the Company that the Work is Completed by the Completion Date to meet the Company's obligations and responsibilities of the Project stated in the Main Contract in a timely and duly manner.

**E.** Contractor agrees that it has obtained for itself a full understanding and knowledge of Project and Work and of the conditions of the Main Contract, under which the Work shall be carried out according to documentation provided by Company which will be the natural attachments of this Contract. Contractor specifically agrees and acknowledges that Contractor shall perform the Work as detailed hereunder in the Contract on the basis of the Back-to-Back Principle in accordance with the Main Contract.

**NOW, THEREFORE,** for and in consideration of the premises continued herein, the Parties hereby agree as follows:

## 1. INTERPRETATION AND DEFINITIONS

**1.1** References in the Contract to Clauses, recitals, appendices, tables, exhibits or schedules are to Clauses of, recitals, appendices, tables, exhibits, and schedules to this Contract.

**1.2** Clause headings are included for information and ease of reference only and shall not be construed as limiting or extending the meaning of any of the provisions contained within the said Clause.

**1.3** Words importing the singular shall also import the plural, as the context so requires, and vice-versa.

**1.4** References to any law, instrument or enactment shall include references thereto as varied, supplemented or replaced from time to time or, as applicable, as extended, re-enacted or amended.

**1.5** The words of inclusion shall not be construed as terms of limitation, so that references to included matters shall be regarded as non-exclusive, non-characterizing illustrations.

**1.6** In the event of conflict or inconsistency between the Clauses of the body of the Contract and the appendices hereto, the provisions of the Clauses shall always prevail.

**1.7** In the Contract, unless the context otherwise requires, the following words and expressions shall have the respective meanings ascribed to them as follows:

1.7.1 **"Advance Payment"** has the meaning in Clause 18.9 of this Contract.

1.7.2 **"Advance Payment Bank Guarantee"** has the meaning in Clause 18.9 of this Contract.

 

1.7.3 **"Affiliate(s)"** means with respect to any person, all persons directly or indirectly controlling, controlled by or under common control with such person, where control may be by either management authority, contract or equity interest.

1.7.4 **"Applicable Laws"** means all applicable statutes, statutory instruments, codes of practice, guidance notes, bye-laws and other regulations of any local or other statutory governing or public authority or body, or any other lawfully constituted regulatory body having authority or jurisdiction over the Work of any Party or as applicable in the Republic of Bulgaria or any other relevant jurisdiction.

1.7.5 **"Back-to-Back Principle"** is the principle the details of which are set forth under Clause 3.2 of the Contract.

1.7.6 **"Best Industry Practice"** means the exercise of that highest degree of skill, diligence and prudence which would be expected from a skilled and experienced contractor engaged in the same type of undertaking under the same or similar circumstances and acting generally in accordance with the Contract, and Applicable Laws.

1.7.7 **"Call Out Order"** means written notification of the Company to Contractor to start mobilization of Contractor's Personnel and Contractor's Materials for the Project which can also be provided through electronic e mail.

1.7.8 **"Claims"** means claims (whether in tort, contract or otherwise at law or otherwise, arising out of, related to, or in any way connected with this Contract or the performance of Work), liens, judgements, penalties, awards, remedies, debts, liabilities, damages (excluding exemplary damages), demands, costs, Losses, expenses (including without limitation, attorneys' fees and costs of litigation) of any kind or character or causes of action, fines, penalties and proceedings of whatever nature, including without limitation, those made or enjoyed by dependents, heirs, claimants, executors, administrators, successors, survivors or assignees.

1.7.9 **"Company"** means UGS DRILLING CHIREN DZZD, as described in the beginning of the Contract.

1.7.10 **"Company Group"** means UGS DRILLING CHIREN DZZD and the partners, GLAVBOLGARSTROY AD, GLAVBOLGARSTROY INTERNATIONAL AD and GAS PROJECT DEVELOPMENT EOOD and Company's other contractors and their respective subcontractors (of any tier), and the agents, officers, directors, and employees of all of them.

1.7.11 **"Company's Materials"** means equipment and materials provided by Company to Contractor for performance of the Works.

1.7.12 **"Company's Representative"** is Maya Pencheva, Legal nominated representative of UGS Drilling Chiren DZZD as provided in Clause 32.1 of the Contract.

1.7.13 **"Completion"** means taking over of the Works by Company in accordance with the provisions of this Contract and Completion occurs in relation to the Works on the date stated in the Final Acceptance Certificate for the Works. **"Complete"** and **"Completed"** shall be construed accordingly.

1.7.14 **"Confidential Information"** has the meaning in Clause 23 of this Contract.

1.7.15 **"Consequential Loss"** means all consequential loss or damage including,



but not limited to, loss of actual savings or anticipated savings or either or both of these, loss of anticipated profit or revenue or either or both of these, loss of use, loss of agreement or contract or either or both of these, loss of or deferment of production (whether caused directly or indirectly), business interruption or increased cost of working or either or both of these, any indirect, special or consequential loss or damage or any or all of these howsoever caused, arising out of or in connection with the Contract and whether or not foreseeable at the Effective Date.

1.7.16  **"Contract"** means this "Lump Sum Turn Key Integrated Project Management Contract for Drilling 13 UGS Wells and All Associated Services Regarding Chiren Underground Gas Storage Expansion Project".

1.7.17  **"Contractor"** means MEADS-MAES USA CHIREN JOINT VENTURE COMPANY, as described in the beginning of the Contract.

1.7.18  **"Contractor's Default"** shall have the meaning ascribed to it under Clause 29.1.2 of this Contract.

1.7.19  **"Contractor's Materials"** means any and all items including Drilling Rigs, Drilling services equipment, tools, machineries, equipment, chemicals, consumables, Deliverables, drill strings, tools, spare parts, consumables, maintenance, support, services, materials, supplies, , etc. which is required to be supplied or used by Contractor Group in performance of the Works pursuant to the Contract, including but not limited to those listed in Appendix "Equipment and Material Provided by Contractor" and those items which are not stipulated in the Contract but required due to relevant sector/industry practice, the nature of the Works

1.7.20  **"Contractor Group"** means Contractor and the partners ME-ADS PETROL VE JEOTERMAL SAHALARI HİZMETLERİ SANAYİ VE TİCARET LİMİTED ŞİRKETİ, Turkey, and MEDITERRANEAN ADVANCE ENERGY SERVICES LLC, USA, and its Subcontractors (of any tier), and the agents, officers, directors, and employees of all of them.

1.7.21  **"Contractor's Personnel"** means the persons (including Subcontractors of any tier, their personnel, and Key Personnel) hired directly or indirectly by Contractor from time to time to conduct the Works.

1.7.22  **"Contract Price"** has the meaning in Clause 18.2 of this Contract.

1.7.23  **"Contractor's Representative"** is İsmet Yücetaş/General Manager and as provided in Clause 32.1 of the Contract.

1.7.24  **"Corporate Income Tax"** has the meaning in Clause 27.1 of this Contract.

1.7.25  **"Defect"** means in respect of any Works or Contractor's Materials any defect, flaw, legal encumbrance or other incompliance with the requirements and the terms and conditions of the Contract or Applicable Law.

1.7.26  **"Defects Liability Period"** has the meaning in Clause 10.1.2 of this Contract.

1.7.27  **"Deliverables"** means those Contactor's Materials which will form an integral and inseparable part of the Wells and the Works and therefore will not, due to the nature of the Works, be returned to Contractor by Company.

1.7.28  **"Demobilization"** means Contractor's demobilization of Contractor's Materials (except for Deliverables), Contactor's Personnel, its Subcontractors



from the Site.

1.7.29 **"Drilling"** means drill, deepen, side-track, workover, re-enter, tieback and any other such operations on a Well, until Completion of the Work and the Well is either suspended, Completed as a production Well or plugged and abandoned. "Drill", "Drilled" "Re-Drill" and "Re-Drilled" are to be construed accordingly.

1.7.30 **"Drilling Rig(s)"** means Drilling Rig or Rigs which are going to be used to perform Drilling operations as per Contract.

1.7.31 **"Exploitation Wells"** means, ten stage wells E-74, E-75, E-76, E-77, E-78, E-79, E-80, E-81, E-82 and E-83.

1.7.32 **"Observation Wells"** means, three stage wells O-1, O-2 and O-3.

1.7.33 **"Effective Date"** means, the date on which the Contract is signed between Company and Contractor as written on the cover page of the Contract.

1.7.34 **"Employer"** means Bulgartransgaz EAD, having its seat and registered address at: 1336, the city of Sofia Municipality, residential district Lyulin 2, 66 Pancho Vladigerov Blvd. with UIC 175203478, the official "CONTRACTING AUTHORITY of Expansion of Chiren UGS capacity- Wells".

1.7.35 **"Final Acceptance Certificate"** means the act signed by Employer upon Completion of the Works (Standard Form 16) for each Well that is certifying that all Drilling, Well Completion and Associated Services and Works including documentation specified in the technical documentation have been completed by Contractor in conformity with the Contract and Applicable Laws and approved by Employer and may be used.

1.7.36 **"Force Majeure"** has the meaning in Clause 26.2 of this Contract.

1.7.37 **"Free of Charge Stand-By Period"** has the meaning in Clause 9.2.iii, 9.5, and 30.3 of this Contract.

1.7.38 **"Governmental Authority"** means the sovereign state of the Republic of Bulgaria and the Government of the Republic of Bulgaria, all central, state, local, municipal or other governmental bodies or agencies or subdivisions thereof, having or asserting governmental or administrative authority over Employer, Company and Contractor, or over any part or all of the Works and/or the Project.

1.7.39 **"HSE"** means Health, Safety and Environment.

1.7.40 **"IPM"** means Integrated Project Management.

1.7.41 **"Key Personnel"** means the key personnel of Contractor to safely execute and manage the project according to Contract.

1.7.42 **"LCIA"** means the London Court of International Arbitration.

1.7.43 **"LIBOR"** means the London Interbank Offered Rate (expressed as an annual percentage rate) for 3 (three) months US Dollar deposits as published by Reuters (or an equivalent successor) at around 11:00 am London time on the relevant day, or if such rate has ceased to be available, any successor or equivalent generally accepted reference rate (in US Dollars for 3 (three) months) agreed by the Parties and, if no such successor or equivalent generally accepted reference rate exists, the reasonably available funding costs (in US Dollars for 3 (three) months) of the person to whom payment is owed.

i-7

 

1.7.44  **"Loss"** means any loss, or damage (direct and/or indirect), including any cost, injury, liability, obligation, expense (including interest, penalties, attorneys' fees and disbursements), litigation, proceeding, Claim, charge or penalty suffered or incurred by a person.

1.7.45  **"LSTK"** means that a lump sum price is agreed for the execution of the whole IPM Scope where the Contractor undertakes to conduct the Works on turn key basis.

1.7.46  **"Main Contract"** means the contract which has been signed by and between Company and Employer on 06/04/2023 within the scope of the Project, which is an integral part of this Contract as an appendix

1.7.47  **"Milestone(s)"** means each of the milestones identified in appendix "Scope of Work & Project Deliverables" hereto, where milestones are same to those on payment terms.

1.7.48  **"Milestone Date"** means, in relation to each Milestone, the date for achievement identified for that Milestone in appendix "Scope of Work & Project Deliverables".

1.7.49  **"Mobilization"** means mobilization of Contractor, Contractor's Personnel, Contractor's Materials and its Subcontractors to Site. Mobilization starts from moving first personnel or equipment from its original location to Work Site, until being ready to spud the first Well.

1.7.50  **"P&A"** means Plug and Abandonment.

1.7.51  **"Party/Parties"** means individually Company or Contractor, collectively Company and Contractor.

1.7.52  **"Personal Income Tax"** has the meaning in Clause 27.1 of this Contract.

1.7.53  **"PMS"** means Preventative Maintenance System.

1.7.54  **"Project"** means "Spatial planning, investment design, supply of the necessary materials and equipment, construction and commissioning of construction site: Expansion of Chiren UGS capacity – Wells", Reference number: 220-081.

1.7.55  **"Provisional Acceptance Certificate"** means a certificate (Standard Form 15) to be issued by Company to Contractor after completion of the Well construction Works.

1.7.56  **"Punch List Items"** means any minor outstanding work or Defects which (whether separately or taken together) do not prevent the Completion and, in the opinion of Company, do not affect the health and safety of users, nor prevent or inhibit the Project from complying with Applicable Laws or with the standards of operation and maintenance applicable to the Project during the operations phase in accordance with the Contract.

1.7.57  **"Scope of Work"** means the scope of Works to be carried out by Contractor pursuant to the Contract, as listed in appendix "Exhibits of Scope of Works".

1.7.58  **"Logistic Base"** means the location of Contractor's base used for storage, transportation, inspection and any other related business to conduct the Drilling, Well Completion, Decommissioning and associated services.

1.7.59  **"Signature Date"** is the date stipulated in the introduction section of this Contract.

 

1.7.60 **"Site"** means the location where the UGS Wells shall be Drilled, also Company's and Contractor's bases located nearby Chiren field used in order to perform the Works under this Contract.

1.7.61 **"Stand-By"** means inability to perform the Works due to reasons attributable to the Company, while Contractor is fully Mobilised and ready to resume Works according to the Contract. Stand-By does not include delays due to the reasons attributable to Contractor and any circumstances.

1.7.62 **"Stand-By Cost"** has the meaning in Clause 9.2.iii, 9.5, 30.3, and 30.4 of this Contract.

1.7.63 **"Subcontractor"** means a company, person, or partnership to whom Contractor, or any of its Subcontractors of any tier, has sub-let a part of the Work, which includes any main Subcontractors nominated by Contractor.

1.7.64 **"Target Date for Completion"** means the date of 320 days after first Well spud date.

1.7.65 **"Termination for Convenience"** shall have the meaning ascribed to it under Clause 29.2.1 of this Contract.

1.7.66 **"UGS"** means Underground Gas Storage.

1.7.67 **"VAT"** means Value Added Tax.

1.7.68 **"Well Completion"** means finishing the Well test operation and closing the sub surface safety valve, which also means that the particular Well is physically finished according to the Contract; for the avoidance of doubt Well Completion does not means Completion.

1.7.69 **"Well(s)"** means any and all 13 (thirteen) UGS Wells to be Drilled by Contractor as per the terms and conditions of the Contract and Applicable Laws.

1.7.70 **"Work(s)"** means the performance of any of Contractor's obligations under the Contract and its appendices, including but not limited to the performance of the engineering and design services, the Drilling services and the supply of the Contractor's Materials.

1.7.71 **"Work Product"** has the meaning ascribed to it under Clause 10.3 of this Contract.

1.7.72 **"Work Schedule"** has the meaning ascribed to it under Clause 16 of this Contract.

## 2.    EFFECTIVE DATE

**2.1**  This Contract shall be effective and shall take effect from the Effective Date.

## 3.    SUBJECT OF AGREEMENT, BACK-TO-BACK PRINCIPLE AND APPENDICES

### 3.1    Subject of Contract:

Contractor mainly shall provide—2 (two) Drilling Rigs, and other Contractor's Materials, and perform the Works in accordance with the terms and conditions of the Contract and its appendices as well as the Main Contract (on Back-to-Back Principle basis to the extent applicable to Contractor's Scope of Work herein) and, as a full and complete compensation against Contractor's performance of any and all obligations under the Contract including the Works in compliance with the Contract and its appendices and Applicable Laws, Company agrees to pay Contractor the Contract Price in accordance with the rates, terms and conditions herein contained.





The Contract is on lump sum turn key ("**LSTK**") basis which refers to an agreement between the Parties where a lump sum price is agreed for the execution of the whole Project (in the case at hand, the Work) and Contractor is required to duly deliver the Work to Company.

### 3.2  Back-to-Back Principle Basis:

In light of the "Back-to-Back Principle" basis that the Contract leans on; Contractor hereby agrees, declares and undertakes that it has full knowledge and clear understanding of all rights and obligations and time schedules of Company under the Main Contract; and Contractor has undertaken all of its obligations under the Contract as being aware of the obligations of Company under the Main Contract.

Contractor agrees, declares and undertakes to fulfill all of its obligations under the Contract to ensure Company's duly fulfilment of its respective obligations under the Main Contract in a full, complete and timely manner in accordance with Target Date for Completion.

As long as Contractor is entitled to any relief under the Contract, to the extent and degree that the relief provided by Employer to Company under the Main Contract relates to the relief that Contractor is entitled to under the Contract, Company shall grant relief to Contractor at most the same rights that Company has (especially in terms of extension of time and/or compensation and/or additional payment) vis-à-vis Employer under the Main Contract, within the frame of same boundaries and same restrictions (especially being within the boundaries of actual and final paid amounts and actual and final extensions of time) in accordance with the Back-to-Back Principle.

In case of discrepancies in respective clauses between the Contract and the Main Contract, the Contract between Contractor and Company shall prevail. Contractor's responsibility is restricted with this Contract and all its appendices.

Any express provision of this Contract shall prevail over the Main Contract, the Main Contract shall govern any matter within the subject hereof which is not stipulated in this Contract if any.

### 3.3  Appendices:

The Contract shall comprise the following documents and Contractor hereby agrees and undertakes that it shall perform the Work in accordance with all documents provided by Company. In the event of different provisions imposing different standards of performance, Best Industry Practices (as applicable) to be determined by experts (appointed by the Parties) shall prevail.

i.    Scope of Work & Project Deliverables will be performed by MM USA CJV:

1.   Integrated Project Management (including Engineering and design of the Wells);

2.   Provision of Drilling Rigs and Services;

3.   Provision of Drilling Bits;

4.   Provision of Mud Logging Services;

5.   Provision of Directional Drilling & LWD Services;

6.   Provision of Cementing Services and Consumables;

7.   Provision of Wireline Logging Services;



8.   Provision of Drilling Fluid Services and Consumables;

9.   Provision of Well Completion Services and Materials;

10.  Provision of Well Testing Services;

11.  Provision of Tubular Running Services;

12.  Provision of Waste Management Services (on Location);

13.  Provision of Casings;

14.  Provision of Casing Accessories;

15.  Provision of Well Heads;

16.  Provision of Commissioning of any Completed Well;

17.  Provision of any other service that might be necessary to fulfil the Main Contract requirements.

ii.   Responsibility Matrix;

iii.  HSE Management and Contractor Policies;

iv.   Compensation and Payment Schedule;

v.    QA/QC Requirements;

vi.   Equipment and Material Provided by Contractor;

vii.  Equipment and Material Provided by Company;

viii. The Advance Payment Bank Guarantee Template;

ix.   The Performance Bank Guarantee Template;

x.    The English translation of the Main Contract and its appendices including Technical Specification (to the extent applicable to the Work) provided by Company;

xi.   Chiren UGS - Updated Geomodel and Forward Development Plan dated July 2023 and number of Wells;

xii.  List of Key Personnel and Organization Chart.

## 4.   CONTRACTOR'S OBLIGATIONS

**4.1**  Contractor shall provide all documents which are required in order the Contractor to be approved by Employer for the Project according to Applicable Laws. Company will submit the documents together with a copy of the signed Contract to the Employer within three business days after it has received all necessary documents

in order for MM USA CJV  to be officially accepted by Employer as the drilling subcontractor responsible for the drilling of thirteen (13) Wells at the Chiren UGS site in accordance with this Contract.

**4.2**  Under the Contract, Contractor shall carry out and Complete any and all Works stipulated in the Contract and its appendices, especially in appendix "Scope of Works & Project Deliverables will be performed by Contractor, complying with by respective Milestone(s) and Milestone Date(s) in accordance with the terms and conditions of the Contract and the Applicable Laws. In the performance of the Works, Contractor shall always comply with the Instructions of Company unless it is not safe to operate. In case of any discrepancy between the specifications under the Contract and/or in the event that there is a lacunae in respect of a specification according to which the




Works will be carried out, Contractor shall apply to Company and Parties shall exert their best endeavors in good faith to reach mutually acceptable interpretation that reflects the objective intended.

**4.3** Contractor shall not proceed with any operational phases without obtaining Company's written notice to proceed thereof, which can also be provided via electronic mail, provided however that, Contractor shall solely request any extension of time claiming that Company delayed issuance of a notice to proceed to the extent such delay arises from willful misconduct or gross negligence of the Company and in case Contractor anticipates that the relevant part of the Work will be delayed if a notice to proceed is not issued within a reasonable time period, it shall request from Company to issue the notice to proceed immediately.

**4.4** All materials, equipment, programs, methodologies, and everything connected to the execution of the Works as per the Responsibility Matrix must be approved by Company before order/purchase. Any pre-approved materials will be accepted and cannot be rejected by Company or Employer in later phases. Any material brought for the Project without pre-approval of the Company has right to reject it with an technical justification. In case certain not pre-approved item/items do not comply with the Technical Specification requirements and/or with the Contract and/or the Responsibility Matrix and/or, the Company has the right to deny the usage of the item/items and request their substitution with such item/items which comply with the above-mentioned. All expenses in such case will be entirely born by Contractor.

**4.5** In all cases under Clause 4.3 and 4.4 when approval of Company is required to proceed with any Work, Contractor will request from Company such approval or notice to proceed reasonable time in advance.

**4.6** Contractor shall mobilize all Contractor's Personnel, Contractor's Materials and Drilling Rigs and any other component, equipment and/or tool necessary for timely implementation of the Works to the Site by the Milestone Dates ("**Mobilisation**"). In this regard, Contractor shall start mobilizing and delivering Contractor's Materials upon receiving the Advance Payment. Contractor will mobilize its Key Personnel and Drilling Rig to the Site and will be ready to spud the first Well within 15 days from the Call Out Order by the Company for preparation of the Site and readiness for starting of the Works, unless otherwise mutually agreed between the Parties.

**4.7** Contractor warrants strict adherence to the obligations prescribed in the Contract for (a) completion of Mobilization within the period stipulated above in Clause 4.6 of this Contract; (b) completion of Milestone(s) by respective Milestone Date(s) as prescribed in the in appendix "Scope of Work & Project Deliverables", and (c) Completion of Works until the Target Date for Completion, time being declared of the essence in all cases.

**4.8** Contractor shall provide Drilling services to Company in accordance with the Integrated Project Management ("**IPM**") principles on LSTK basis, which includes the following:

**i.**   IPM scope coupled with all necessary Drilling services

**ii.**   Provision of Two (2) Drilling Rigs, its manning and other associated services

**iii.**   Drill 10 (ten) Exploitation Wells from E-74 to E-83

**iv.**   Drill 3 (three) Observation Wells O-1, O-2 and O-3

**v.**   Performing all logistics related with Drilling Rigs and other associated services

**vi.**   Reporting as per IADC standards and Clients Reporting requirements.



 

**vii.** Provision of adequate personnel for all IPM-related Drilling and management operations on Drilling Rigs.

**viii.** Provision of all material required for all Drilling operations (including casings, wellheads, pup joints, tubing, completion, packers, valves and etc.) including Contractor's Materials.

**ix.** Any and all other related services associated with the IPM scope.

**4.9** It is a condition of the Contract that the Works (as applicable) and Contractor's Materials shall (unless otherwise agreed in writing) be free from any Defects, including:

**i.** be of good and sound design, materials and workmanship and in compliance with the Best Industry Practice;

**ii.** be of merchantable quality and fit for the purpose intended under the Contract;

**iii.** conform as to quantity and description with the particulars stated in the Contract;

**iv.** correspond with samples and/or patterns, if any, referred to in the Contract;

**v.** conform to all specifications and all applicable codes and standards set out in the Contract (including all specifications and all applicable codes and standards incorporated by reference therein);

**vi.** comply with all Applicable Laws applicable to the Works;

**vii.** be free from any Defect in title;

**viii.** be provided in accordance with the Contract.

**4.10** The Contractor represents and warrants that it is fully experienced, technically qualified, capable, and willing to execute the Work subject to and in accordance with the documents referred to herein as well as in accordance with the Best Industry Practice. Contractor is an expert in the provision of the Works and Company is at all times relying on the skill, knowledge, experience and workmanship of Contractor. In case the Contractor finds that certain requirements by the Technical Specification, part of the Main Contract, are not relevant, are unnecessary and may lead to the worse quality or longer time of execution, the Contractor may prepare a well-founded, justified technical proposal for change. However, all such proposal must be approved and accepted by Company and Employer. The Contractor does not have the right to change the technical specifications and the materials without prior written approval by the Company.

**4.11** Contractor shall perform its obligations under the Contract with all due diligence, in good and workmanlike manner to the specifications and standards contained in the Contract and in accordance with the provisions of the Contract and Best Industry Practices.

**4.12** Based on information presented by Company Contractor warrants that it has informed itself fully and studied carefully the specifications, drawings, and all other data relating to and necessary for the performance of the Contract, and has obtained for itself a full understanding and knowledge of the nature and scope of the Contract and of the prevailing conditions relevant thereto, under which the Works will be performed. Contractor warrants that such documents and information are sufficient to design and construct the Well. If Contractor notices that additional information required Contractor will request from Company before execution if available. Therefore, Contractor shall not be liable for any consequences of deviations of actual





subsurface conditions from the information provided by the Company. In case of deviations of actual subsurface conditions Contractor will prepare a technical proposal regarding the measures to be taken according to Best Industry Practices with its estimated time and cost impact. Contractor shall engage into any such measures and Works only if the proposed measures and activities have been approved by the Company, which approval shall not be unreasonably delayed.

4.13 Contractor shall employ experienced and competent personnel of adequate quality and number to conduct the Work in a timely manner and with quality. Contractor further represents that it shall continuously be able to provide such personnel and shall ensure that Key Personnel shall not be replaced, without the prior approval of Company of a suitable successor, which approval shall not be unreasonably withheld or delayed. Unless otherwise agreed to by Company, in order to ensure that continuity of the WORK is maintained and where practical, any replacement shall work alongside the person who is to be replaced for a reasonable handover period, at no additional cost to Company. Contractor shall exert all reasonable efforts to perform the Work with its own permanent staff employees in preference to agency personnel. Contractor shall be responsible for providing all necessary accommodation, catering, medical care and welfare facilities for Contractor's and Subcontractors' personnel and shall pay on the due date the social security premiums, severance and notice payments of its employees and shall provide the relevant information and documents when requested by Company and provide all work permits for its foreign personnel who shall be assigned for Works under the Contract. Contractor is also obliged to comply and ensure that the Subcontractors comply with the requirements of the Applicable Laws including social security law and requirements, in relation to their personnel who will be working for the performance of the Works. Contractor's Personnel has right to access to work Sites without any limitation and cannot be denied access unless it is mutually agreed between the Company and Contractor or any legal authorities.

4.14 Contractor shall give or provide all necessary superintendence during the execution of the Works, and an employee of Contractor which will be approved by Company shall provide full-time superintendence of the Works. All supervisory staff shall be sufficiently qualified and experienced to give adequate supervision to the Work which they are assigned to supervise.

4.15 Contractor shall not be relieved from its liabilities under the Contract and shall be fully responsible for the consequences of the acts and omissions of its personnel, agents, Subcontractors or their personnel. Notwithstanding any other provisions in the Contract, Contractor is jointly and severally liable to Company for its, its employees', Subcontractors', assistants' acts, omissions and/or actions, in relation to the performance of the Works under the Contract. For the avoidance of doubt; even if the relation between Contractor and its aforesaid personnel, Subcontractors and/or assistants comes to an end, Contractor shall remain liable to Company for the acts and/or actions and/or omissions of these persons made over the course of their contractual relationship with Contractor.

4.16 Company shall be responsible for and liable for and shall defend, indemnify and hold harmless the Contractor Group from and against any and all liabilities caused by the acts, omissions, fault, breach of Contract or statute, or negligence of any member of Company Group.

4.17 Contractor shall follow any and all procedures of Company regarding any Work to be carried out by Contractor. All costs incurred in relation to the requirements resulting from above shall be borne by Contractor. If any directions or order given by the





Company deviates from or is out of the pre-agreed scope of work, Contractor shall inform immediately Company upon receiving such order specifying the necessity of such additional works and any possible impact on the costs of the Agreement, and all related cost should be additionally negotiated and awarded upon a quotation presented by the Contractor only if accepted by the Company in writing.

**5.    INSPECTION, MONITORING, TESTING AND EXPEDITING**

**5.1**   The Company and Employer, by their authorized officers and agents, shall at all times be granted access to Contractor's premises and the Site(s) to enable Company and Employer to ensure that the Works will comply with and be supplied in accordance with the Contract. This may include expediting, inspecting, monitoring and testing of the Works during and on Well Completion and Completion of the Works provided that any such former act of Company shall be without interference with or delay of the Works or without interference with the Contractor's employees.

**5.2**   For the purposes of Clause 5.1 hereof Contractor shall make available such of Contractor's Personnel, Contractor's Materials and such tools, instruments, apparatus, equipment, facilities, services and materials for carrying out such retests, to Company, as Company and/or Employer may request without interrupting or delaying the current Work Schedule.

**5.3**   Where the Contract provides for inspection by or on behalf of Employer and/or Company by Contractor, at least 7 days' prior notice shall be given to Company when the whole or any part of the Works will be ready for inspection or testing.

**5.4**   For any Company's Material (if any) Contractor will perform, a selective inspection via an accredited third-party entity selected by Contractor at a Company's cost. Full certification and full compliance with API (American Petroleum Institute) requirements will be provided by Company to Contractor prior to unloading the material at the Base, which is the responsibility of the Company.

**6.    COMPANY'S MATERIALS**

**6.1**   Company shall, for the purpose of performance of the Works by Contractor under the Contract, provide Company's Materials to Contractor and, such Company's Materials shall always be and remain the property of Company. Notwithstanding the provisions of Contract, after delivery to Contractor, Company, shall remain responsible and liable for such Company's Materials.

**6.2**   Contractor shall clearly identify and mark as "the property of Company", separately store, safeguard, maintain in good order and condition all Company's Materials and keep such records as Company may require.

**6.3**   Contractor shall use all Company's Materials economically and solely in connection with the Contract and the Works.

**6.4**   All scrap and surplus of Company's Materials are to be marked as "the property of Company", kept separately and reported for disposal instruction at regular intervals to Company. Within 7 days following issuance of Final Acceptance Certificate by Employer, Contractor shall return Company's surplus of Materials to Company as operational and in a good condition as provided to Contractor for the performance of the Works, excluding normal wear and tear.

**6.5**   Contractor shall be obliged to inspect all Company's Materials both in respect of quantity as well as quality and check all supporting documentation before use of the same and notify Company, in writing, of any discrepancy or damage to any items of Company's Materials within 7 working days of receipt thereof, failing to do so

i-4

 

meaning that Company's Materials have been accepted by Contractor. If Contractors finds any discrepancy or damage, it is entitled to elect not to use a Company's Material relying on the outcomes of such inspection, which must be justified duly in a written report. If such defects or discrepancies in Company's Materials result in delays or additional costs for the Works, Contractor shall be entitled to extension of time or additional payment for necessary costs, except such outcomes are caused by the Contractor's fault or negligence. All the inspection-related cost of Company's Material shall be borne by Company. In case of contestation issued by the Company, a third impartial party shall judge accordingly. Upon acceptance by Contractor of any Company's Materials, or failure to notify of any defects or discrepancies within the term set out above, or start of use by Contractor of such Company's Material, Contractor warrants that such Company's Materials are fit for the purpose of being used in the Works and are free from apparent defects.

## 7. TITLE AND RISK OF LOSS

**7.1** Without prejudice to the rights and obligations of the Parties under the Contract and unless otherwise agreed in writing, the ownership of the Well programs, the documents generated by Contractor, Drilling programs, tools, patterns, drawings, designs, equipment or materials and other items which form the inseparable part of the Wells and the Works shall be transferred to Company at issuance of Final Acceptance Certificate for the relevant Wells, as the case may be.

**7.2** The ownership of the Deliverables will pass to Company after being invoiced by Contractor and paid.

**7.3** Irrespective of any transfer in title to any Deliverables, Company's Materials and/or Works, from the commencement of the Works until the issuance of Provisional Acceptance Certificate by Company in respect thereof, Contractor shall take full responsibility for the care of, and shall bear the risk of damage or loss to, such, Deliverables, Company's Materials and Works, together with all goods, equipment and materials incorporated therein.

**7.4** In case any damage or Loss shall occur to the Deliverables, Company's Materials and/or Works or any part thereof, together with all goods, equipment and materials incorporated therein or to be incorporated therein, from any cause whatsoever, for which Contractor is responsible, Contractor shall promptly repair and make good the same at no cost to Company.

**7.5** Should any lien or encumbrance filed, claimed or registered by any person against any Deliverables, Company's Materials, Wells, Works and/or Site or any property of Company and/or Employer or against any monies then due or to become due to Contractor from Company, Contractor shall immediately notify Company.

## 8. RESPONSIBILITY FOR THE WELL

**8.1** In the event of loss of or damage to any Well while the Work is being performed, Company shall be responsible for and shall save, indemnify, defend and hold harmless Contractor Group from and against any resulting Claims, Losses, damages, costs (including legal costs), expenses and liabilities including the cost of regaining control of the Well except to the extent that such loss or damage is caused by the negligence or willful misconduct (whether statutory or otherwise) of Contractor Group, whereby Contractor liability shall be determined in accordance with Clause 8.2.

**8.2** In the event of loss of or damage to any Well in accordance with Clause 8.1, Contractor's liability shall be limited to performing all Remedial Work. Remedial work




means all things necessary or expedient to restore the situation of the Well (including without limitation, as may be applicable, inspections to locate the hole, damage surveys, removal of debris and wreckage, re-entry into and/or making safe the old Well, re-Drilling and running casing, but excluding the cost of regaining control of the Well) and shall involve the use of all available Contractor's Materials and Contractor's Personnel, located at the Sites, and shall be deemed to have started immediately after the loss or damage in question and shall end either when:

(a) the Well or casing is restored to the state it was in immediately prior to the loss or damage,

(b) a new replacement Well reaches the same depth and is in the same condition as the old Well immediately prior to the loss or damage, or

(c) the Well in question has been properly abandoned in accordance with good oilfield practice, in the event where restoration or re-drilling is impossible.

## 9.  TIME OF PERFORMANCE

9.1  Contractor acknowledges the importance to Company of performing the Works at the times specified in the Contract and undertakes to take all steps necessary to achieve the Milestone(s)/Milestone Date(s) so specified. Time and performance under this Clause 9 shall be complied with by the Contractor.

9.2  The major execution stages of the Contract consist of the below-mentioned breakdown with their respective periods:

   **i.  Drilling 10 (Ten) Exploitation Wells and 3 (Three) Observation Wells:** Company shall notify Contractor to proceed with the Drilling operations of UGS Wells and Contractor should spud the first UGS Well within 15 (fifteen) days following the date of Company's notice to proceed. Contractor shall Complete 10 (Ten) Exploitation Wells and 3 (Three) observation wells, (UGS Wells), for which purpose Contractor shall perform all related operations and duly Complete and deliver the scope of Contract within 320 (three hundred twenty) days from the spud date of first UGS Well. After the expiration of such 320 (three hundred twenty) days and in case Contractor is not able to timely Complete and deliver the Works' related scope, Contractor will have a 14 (fourteen)-days grace period to remedy and Complete all Works without occurring any penalty.

   **ii.  Free of Charge Stand-by Period for moving between Wells:** In the case of a Stand-By during Contractor's moving between Wells, there are 2 days (48 hours) per Well per Rig of Free of Charge Stand-By Period during moving between Well locations, for which Company shall not owe Stand-By Cost. It is only applicable if the next Drilling site is not ready to mobilize the equipment on the time of completing previous Well. These 48 hours per Well cannot be accumulated if not occurred. The Company is liable to make Drilling site, roads, and necessary arrangement according to Responsibility Matrix. If Contractor waits more than 48 hours to be able to mobilize to next location due to the Company's default, a Stand-By Cost of 75,000.00 EUR (Seventy-five Thousand Euro) will be charged per each day per Well per Rig.

   **iii.  Liquidated Damages for Contractor's Delay:** If Contractor is late to Complete all Works under the Contract according to 9.2.i Contractor shall pay to Company 37,500.00 (thirty-seven thousand five hundred) Euros for each day of delay.

9.3  Relying on and in compliance with the Milestones/Milestone Dates specified in the





Contract, Contractor shall prepare a detailed Work Schedule for the performance of each item of Works and submit to Company's approval, which shall include; Mobilization, engineering, execution, testing, acceptance and Demobilization and other details and technical specifications requested by Company and/or Employer.

**9.4**   Contractor agrees, declares and undertakes to make necessary revisions on the Work Schedule as directed by Company. Contractor shall immediately notify Company of any event or circumstance that may give rise to any delay in the performance of the Works. Contractor shall immediately give details to Company's Representative of the effect or anticipated effect and estimated costs on the performance of its obligations under the Contract and such action as it intends to take to mitigate the same. In the event of any delay to be arisen due to the Company's revision Company shall extend the duration for additional periods equal to those for which the performance of Work was delayed. Company shall pay or reimburse Contractor for all costs approved by Company in writing and arising from or in connection to the revisions on the Work Schedule, as directed by Company.

**9.5**   If the Work has to stop or gets interrupted due to Company's delay in its or Employer's decision-making process, this qualifies as a Stand-By. In such case a Free of Charge Stand-by Period of total of 48 (forty-eight)-hour period per Rig per Well applies. After such period Contractor is entitled to receive 75,000-EUR (Seventy-five Thousand Euro) per day (Stand-by Cost) for the Stand by Company is in delay for each Drilling Rig as sole and exclusive remedy of Contractor for such interruption or delay provided that there is no fault attributable to Contractor under the Agreement. It is agreed that the Stand-By Costs are Contractor's sole and exclusive remedy of Contractor for any interruption or delays due to Stand-By.

**9.6**   Should it become reasonably apparent that performance of the Works or part thereof will or may be delayed apart from the reasons attributable to Contractor, Contractor shall forthwith:

    **i.**   give notice to Company of the cause of the delay together with details of all factors affecting such delay and an estimate of the length of the delay; and

    **ii.**   provide to Company for investigation, detailed particulars of any change to the Contract which Contractor may consider necessary for extending the time for performance of the Contract.

**9.7**   For the avoidance of doubt, in case of delay attributable to Contractor, in no event Contractor can request or is entitled to any extension of time to perform the Works or any other remedies.

**9.8**   Contractor shall at all times prevent, avoid, overcome or minimize any delay or risks of delays and shall take all measures as may be necessary at no expense to Company (except in cases of breach on the part of Company in which case Contractor shall be entitled to request its direct and documented costs in accordance with the Contract) to proceed with the Contract.

**9.9**   Contractor warrants and undertakes that: (i) Provisional Acceptances and Final Acceptance shall occur on or before the relevant Milestone Dates in appendix "Scope of Work & Project Deliverables". Company shall be responsible to accept the completed Works on time and get the necessary approvals from Employer.

## 10.   DEFECTS LIABILITY PERIOD

### 10.1 Warranty and Defects Liability

    **10.1.1** Contractor represents and warrants that:

i·7




a)     the Wells and Contractor's Materials are critical for the satisfactory provision of the Drilling services and the said Wells and Contractor's Materials will:

i.     be free from Defects in title, design, materials or workmanship;

ii.     be capable of operating in accordance with the Good Industry Practice and all other requirements of the Contract;

iii.     conform in all respects to the terms and conditions of the Contract;

iv.     conform to all specifications and all applicable codes and standards set out in the appendix "Exhibits of Scope of Work" (including all specifications and all applicable codes and standards incorporated by reference therein);

v.     comply with, and be capable of being operated in accordance with, all Applicable Laws; and

vi.     incorporate equipment, machinery and materials that are new and of recent manufacture, normal fair wear and tear excepted,

b)     all Works will be performed at all times:

i.     in a good and workmanlike manner;

ii.     be free from Defects in title, design, materials or workmanship;

iii.     in accordance with Good Industry Practice;

iv.     in accordance with all Applicable Laws;

v.     so as to achieve each Milestones by the applicable Milestone Dates;

vi.     in accordance with the requirements of the Contract, including for the avoidance of doubt all specifications set out in the appendices to the Contract; and

vii.     in accordance with the instructions of Company's Representative (or alternate) as to results to be obtained from the Works,

c)     the Works will be conducted in strict compliance with the terms of any applicable employment agreements or collective labour agreements with the personnel of Contractor and its Subcontractors and with all Applicable Laws pertaining to labour and employment;

d)     it is experienced in the type of Works to be performed hereunder and has the capability, expertise, manpower and technical and financial resources to perform the Works in accordance with the terms of the Contract.

e)     Contractor's Materials will be in good working order, fit for their intended purpose, and conform to the requirements of Good Industry Practice, Applicable Laws and the Contract;

f)     it has the right to use Contractor's Materials for the performance of the Works free and clear from any other contractual obligations, liens, charges or encumbrances of whatever kind that could affect the Works; and

g)     all Contractor's Personnel and its Subcontractors will be fully-trained and competent to perform the Works and to operate the Drilling Units and all other machinery and equipment used for the performance of the Works.

**10.1.2** The Defects Liability Period ("**Defects Liability Period**") for the Completed Work will be 12 (twelve) months after the Provisional Acceptance Certificate.

**10.1.3** The warranty covers only the cementing and completion string for 12





(twelve) months, for the rest of the tangible items, manufacturers guaranties will be passed to Company which should not be less than 12 (twelve) months.

**10.1.4** If during the performance of the Works or during the Defects Liability Period Company notifies Contractor that any Works or Deliverables or any part thereof fail (whether or not accepted by Company), due to the breach of Contractor's warranty, Company shall have the right to (a) give Contractor reasonable notice and specify the Defects found in the Works or Deliverables, and (b) request Contractor to repair, re-perform, replace, or rectify the Works or Deliverables so rejected at the Contractor's expense and risk so that the Works and Deliverables conform to the requirements of the Contract. If Contractor fails or refuses to re-perform, repair, replace, or rectify any rejected Works or Deliverables, the Company shall be entitled to acquire replacement Works or Deliverables from another source and the Contractor shall pay the Company any direct, additional expense reasonably incurred by the Company in remedying the defective performance by the Contractor.

**10.1.5** Where Contractor rectifies a Defect pursuant to the Contract, the Defects Liability Period in respect of the relevant Deliverables, Wells and/or Works re-performed, repaired, replaced, or rectified shall be restarted beginning from the date on which the Defected Deliverables, Wells and/or Works have been re-performed, repaired, replaced or rectified by Contractor and accepted by Company and Employer.

## 10.2 Right of Access

Company shall provide Contractor with access to the Wells and the Site and to records of the working and performance of the Wells as may be reasonable and necessary to enable Contractor to perform its obligations under the Contract, subject to the reasonable constraints required to avoid interference with Company's operation and maintenance of the Wells and the Site. Company may require Contractor to carry out Work under the Contract during planned shutdowns or at such times of the day or night as will minimize the effects on Company and its operations within the Block of any such Work.

## 10.3 Sufficiency of Information

a) On the basis of information presented by Company, Contractor has satisfied itself regarding the nature and scope of the Works and with all matters that may affect the Works, including:

    **i.** the geographic, climatic, weather, and cultural conditions prevailing in the Block or at Site;

    **ii.** third-party services, labour, facilities, airports, and ports available;

    **iii.** Applicable Laws, including all permits required for the performance of the Works.

b) Contractor acknowledges that it has conducted a Site visit and has familiarized itself with the Site conditions, including all estimates, programmes, data, recommendations, information, reports of progress and other reports, including all data, logs, core samples, charts, drawings, tracings, documents, calculations, interpretive and derivative data, reports, analyses, interpretations, evaluations, Well logs, maps, magnetic tapes, cores, cuttings, production data, geological data, geophysical data, geochemical data, engineering data computer printouts and items of a similar nature in relation to or resulting from the Works (**"Work Product"**) which are generated during the Drilling of the Wells as per the Contract, inferences and





assumptions which are not infallible, and with respect to which competent specialists may differ.

c) Contractor warrants that it has received all necessary documents and information related to the Project and the Works, and that they are sufficient, correct, and free from flaws, defects, or omissions, and that the Works may be Completed in accordance with the requirements of the Contract.

### 10.4 Provision of Information; Electronic Data Transmission

a) Contractor shall be responsible for preparing and submitting to Company estimates, programmes, data, information, reports of progress and other reports, including all data, logs, core samples, charts, drawings, tracings, documents, calculations, interpretive and derivative data, reports, analyses, interpretations, evaluations, Well logs, maps, magnetic tapes, cores, cuttings, production data, geological data, geophysical data, geochemical data, engineering data computer printouts and items of a similar nature in relation to or resulting from the Works, as Company may request from time to time including as set forth in appendix "Exhibits of Scope of Works". All documents which require stamp and signature by the issuing part must be submitted accordingly on paper.

b) Contractor shall transmit data and other information to Company electronically, accurately, securely and in accordance with best software industry practice.

### 11. CONTRACTOR'S PERSONNEL

**11.1** Contractor will maintain at all times, and will ensure that its Subcontractors maintain at all times, the personnel necessary to perform the Works.

**11.2** The Contractor's Personnel assigned by Contractor or any Subcontractor to conduct the Works or any part thereof, shall be mentally and physically fit, trained, competent, skilled and experienced in the conduct of the tasks for which they are intended. Documents justifying the above must be submitted to the Company by the Contractor for the Key Personnel.

**11.3** Contractor shall provide or cause to be provided all necessary training, education, instruction and supervision of Contractor's Personnel that is necessary to perform the Works. All Contractor and Subcontractor Drill crew personnel shall be properly trained and certified in Well control operations and all Contractor and Subcontractor personnel shall have all necessary training, licenses and certifications to perform the tasks to which they are assigned.

**11.4** The Key Personnel, together with all Contractor and Subcontractor personnel having the classification of drilling engineer, tool pusher, (or the equivalent of any of the foregoing) shall be able to read, write and speak the English languages required to conduct their duties. When Drilling and other field Works are being performed, Contractor must have at least one person who can both speak and write English on the Site at all times who is capable of communicating both orally and in writing with all other Contractor and Subcontractor personnel at the Well location who do not understand oral or written English.

**11.5** Contractor shall maintain strict discipline and good order among its personnel, and those of the Subcontractors, during the performance of the Works. In the event of negligence, professional incompetence, or non-compliance with Applicable Laws, the appendix "HSE Management and Contractor Policies" by any personnel of Contractor or any Subcontractor, Contractor shall promptly replace (or cause the applicable Subcontractor to replace) at its expense, whether or not requested by Company, any culpable personnel with a competent substitute(s) within 7 (seven) days or such

i-7

 

longer time as may be agreed by Company. This provision shall also apply whenever the behaviour of any personnel of Contractor or any Subcontractor is likely to jeopardize the relationship between Company and any Governmental Authority and/or Employer. Any such personnel shall be immediately removed from the Site at the expense of Contractor. Any personnel removed for any of these reasons shall not be engaged again in the Works without the prior written approval of Company.

**11.6** Contractor will be responsible, at its expense, for all medical and hospital expenses of its personnel and those of its Subcontractors. Such personnel shall undergo such pre-employment and periodic medical examinations as may be required by Contractor Doctor or Best Industry Practice provided, however, that Company may request any other reasonable medical examinations as it may deem necessary and Contractor shall cause such additional examinations to be performed at Contractor's expense. To the extent legally permissible, medical certificates, upon request, shall be made available for inspection by Company.

**11.7** Contractor shall obtain and provide at its expense all visas, work permits, exit and re-entry permits, and all other authorizations or documentation required under Applicable Laws in connection with the employment or exit of its personnel and those of its Subcontractors from Bulgaria and the Site. Company shall cooperate and help to Contractor in securing such visas and work permits.

**11.8** Contractor will be responsible, at its expense, to provide and schedule for the normal rotation of all its personnel and those of its Subcontractors, including transportation, in compliance with Applicable Laws. Contractor shall ensure that it and its Subcontractors have available sufficient other personnel, who are suitably experienced and competent, to replace such personnel.

**11.9** Contractor shall promptly pay, and shall ensure that its Subcontractors promptly pay, all salaries, wages and other benefits due to personnel engaged in the Works, including, overtime, allowances, social benefits, relocation expenses and fringe benefits of whatever nature and shall ensure that such payments and benefits comply with Applicable Laws.

**11.10** Contractor shall ensure that its and its Subcontractors' personnel are speaking English and are experienced and qualified for the Works they are required to carry out hereunder, to a standard not less than that required by the Contract and that may from time to time be required by the relevant Governmental Authority and Employer and in accordance with Applicable Laws and Best Industry Practice.

**11.11** Neither Contractor, any Subcontractor nor any of their respective personnel shall, except for bona fide medical purposes, keep, sell, barter, give, dispense or otherwise dispose of any drugs or alcoholic liquors to any person at any Site or permit the same to be done by any person. Alcohol shall not be permitted at any part of the Site save in a form generally used in medicine and forming a bona fide constituent of a medical kit.

## 12. CONTRACTOR'S MATERIALS

**12.1** Contractor shall provide, or cause to be provided, at its sole cost and expense, the Deliverables, the Drilling Rigs, and all and any other Contractor's Materials in order to perform the Works). Contractor shall arrange for all necessary replenishment of Contractor's Materials at its expense, and Contractor shall also be responsible for maintaining at all times at its operating base at Site adequate stock levels of Contractor's Materials (including spares/spare parts, replacements and consumables), packed and marked as appropriate, to ensure prompt, efficient, and continuous performance of the Works. Contractor warrants that Contractor's



Materials shall be procured by Contractor.

**12.2** Contractor shall ensure that Contractor's Materials are properly maintained in good working order and repair throughout the performance of the Works. All costs related to any repairs or replacements of Contractor's Materials will be affected by Contractor at its sole cost and expense, unless it is agreed otherwise.

**12.3** Storage and all other related costs and expenses in relation to Contractor's Materials while in Bulgaria shall be borne by Company. In order for Company and the Works to be exempted from custom duties through any exemption might be available, Contractor shall conduct on Contractor's Materials, necessary markings, carriage and appropriate packaging at its own cost and expense and shall provide necessary documentation in relation to the obtaining of such exemption from custom duties and manage the procedure and coordinate with Legal entities with help of Company.

**12.4** Contractor warrants that Contractor's Materials are, operational, updated, inspected and tested. Contractor shall supply, at no cost to Company, such originals or legible certified copies of certificates of analysis, test, inspection or origin as may be required by Company or by Applicable Laws. Any inspection, test or examination of Contractor's Materials required for the purpose of certification, re-certification or otherwise will be conducted at Contractor's expense and will be scheduled so as not to cause a delay to the Milestone Dates.

**12.5** Contractor shall supply and maintain Drilling Rigs a new or used string of drill pipe, drill collars and subs and handling equipment in accordance with the Best Industry Practice. BHA inspection records shall be provided if and when requested by Company.

**12.6** Contractor shall provide and maintain all hoisting equipment as part of Contractor's Materials in accordance with the Best Industry Practice.

**12.7** Contractor warrants that:

(i) it (or a Subcontractor, as applicable) will have good title to all Contractor's Materials;

(ii) Contractor's Materials will conform with all Applicable Laws and meet specification necessary for performance of the Works and as Applicable Laws for the purpose of performing the Works; and

(iii) Contractor's Materials will otherwise comply with the requirements of the Contract.

Contractor shall not utilize in the performance of the Works any Contractor's Materials that fail to conform to the requirements of the Contract. Contractor shall promptly and it its sole expense, and whether instructed by Company, Employer, a Governmental Authority or otherwise, remove from the performance of the Works any such non-conforming Contractor's Materials so that the non-conformance can be repaired or rectified.

## 13. HEALTH, SAFETY, SECURITY AND ENVIRONMENTAL COMPLIANCE

**13.1** In performing the Works, Contractor shall strictly observe and follow (and shall ensure that all Subcontractors observe and follow): (i) all Applicable Laws regarding HSE and relevant to the performance of the Works and (ii) the HSE requirements, commitments, policies, rules, initiatives as set forth in appendix "HSE Management and Contractor Policies" with which it shall conduct the Works. Contractor shall provide conformity with OHSAS 45001 standards. Contractor shall prepare, provide and implement a safety management system.

i-7

 

**13.2** Without limiting other provisions in the Contract, Contractor shall (and shall ensure that all Subcontractors shall):

    (i)   employ Best Industry Practice (including in relation to occupational health and safety and the prevention of environmental damage) in performing the Works;

    (ii)  take necessary and adequate steps to prevent environmental damage arising from the Works and, where some adverse impact on the environment is unavoidable, to minimise such damage and the consequential effects thereof;

    (iii)  ensure that the Works are conducted in an environmentally acceptable and safe manner utilising good occupational health and safety practices consistent with Best Industry Practice.

**13.3** Contractor shall take full responsibility for the adequacy and safety and security of all operations and methods necessary for the performance of Contractor Group's Works, employing all necessary or desirable protective equipment or devices, whether suggested or required by safety associations, Applicable Laws, Employer or any Governmental Authority.

**13.4** Contractor shall comply with (and shall ensure that the Subcontractors comply with) all measures and methods of environmental protection.

**13.5** In the event of an emergency, accident, oil spill and/or gas leak or fire arising from the Works and affecting the environment, Contractor will immediately notify Company and promptly implement a contingency plan and perform such clean-up and remediation activities as may be required in accordance with Applicable Laws and/or Best Industry Practice. In the event of any other emergency or accident arising from the Works affecting the environment, Contractor shall take such action as may be prudent and necessary in accordance with Best Industry Practice.

**13.6** Company may conduct, or require Contractor to conduct, inspections and audits with regard to the HSE systems, policies and procedures in use during performance of the Works, and Contractor shall develop and implement corrective action plans based on the findings from these inspections and audits. Contractor shall fully cooperate with and assist Company in such inspections and audits. Contractor acknowledges that the relevant Governmental Authorities will have similar HSE audit rights.

**13.7** Contractor shall promptly furnish Company with all reports, including documents filed with or received from any Governmental Authority, of any safety, security or environmental incidents, accidents, and near miss incidents that occur during the performance of the Works, and shall fully cooperate with and assist Company in any investigation that Company may elect to undertake.

**13.8** Contractor shall ensure that all waste and rubbish in any form originating from the performance of the Works is collected and delivered to Company.

**13.9** Contractor shall ensure that its contracts with Subcontractors reflect the requirements of this Contract's clause.

**13.10** Contractor must take into account and rectify accordingly all recommendations and/or notifications by Company in regards to HSE related defaults.

**13.11** In case the Company is imposed a penalty by a Government Institution due to Contractor's inaction or negligence, the cost of such penalty will be borne by Contractor.

**14. QUALITY MANAGEMENT**

**14.1** Contractor shall have a documented and fully functioning quality management





system in conformity with ISO 9001. Contractor shall ensure that all proposed Subcontractors have quality systems that are of a similar standard.

**14.2** Contractor shall, based on the said quality management system, produce, document, maintain and operate quality plans for all Works. Each quality plan shall describe the particular Works, and how it is to be performed, and shall include or refer to all applicable policies, procedures, activities, qualifications, resources, and other matters relevant to the Works.

**14.3** Contractor shall implement a management of change system and promptly inform Company of changes in organizational structure, responsibilities, activities, resources, Subcontractors, and events that could have a material influence on Contractor's quality management system during the term of the Contract.

## 15. ENGINEERING AND DESIGN

**15.1** Contractor is responsible for the correctness and accuracy of all detailed engineering, designs, specifications, drawings, data and other technical documents relating to the Works prepared by Contractor Group that **(i)** are contained in the Contract (including the appendices); **(ii)** have otherwise been provided to Contractor prior to the Effective Date; (except with respect to Company provided data); or **(iii)** are prepared or approved by or on behalf of Contractor or any Subcontractor, and any discrepancies, errors or omissions therein, if prepared or furnished by or on behalf of Contractor, any Subcontractor or otherwise, whether or not any of the foregoing have been approved by Company. **(iv)** Any costs born due to any discrepancies or deviations, unless instructed by the Company, from the technical specification shall be on Contractor's expense.

**15.2** Contractor shall complete the design and detailed engineering of the Wells and the Works as described in appendix "Exhibits of Scope of Works" and otherwise in accordance with the Contract and submit the same to Company for a joint review by Company and Contractor in accordance with the Contract. Contractor's design and detailed engineering shall be based upon the requirements of the Contract, Best Industry Practice, Main Contract and its Appendix – the Technical Specification.

**15.3** In 15 days, all Deliverables' specifications will be provided to Company for Employers approval. Contractor will provide the design and detailed engineering of the Wells (detailed Drilling Program) within 45 days after approval of the Deliverables list.

## 16. WORK SCHEDULE

**16.1** Relying on and in compliance with the Milestones/Milestone Dates specified in the Contract, Contractor shall prepare a detailed Work Schedule for the performance of each item of Works and submit to Company's approval on reasonability agreed time, which shall include; Mobilization, engineering and design, execution, testing, inspecting, acceptance and Demobilization and other details and technical specifications requested by Company and/or Employer.

**16.2** Contractor shall comply in all respects with the Work Schedule and in strict conformity with the requirements under the Contract and its appendices.

**16.3** Other work that Contractor is currently or simultaneously performing shall not interfere with the performance of the Work hereunder and, notwithstanding such other work, Contractor is able to and shall bring in additional personnel and other resources if Company so requires.

**16.4** In order to divert any key supervisory, technical or management personnel, plant, labour or equipment assigned to the Work to other programmes, Contractor shall

i·7




notify Company reasonably in advance and shall submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the Work. No diversion shall be made by Contractor or any Subcontractor without the prior consent of Company.

**16.5** Contractor shall commence the Work when so instructed by Company and shall carry out the Work until Completed. In this regard, in case of a delay whether occurred or anticipated, Company shall be entitled to instruct Contractor to accelerate the Work at Contractor's cost, risk and expense.

**16.6** Except where there are specific schedules and/or dates provided elsewhere in the Contract, for Contractor's submittals for approval, Contractor shall submit all matters requiring Company's approval with adequate timelines so that Company clearly has reasonable time to review all such submittals and all support and/or justification submitted therewith.

## 17.  PERMIT TO WORK

Contractor acknowledges that it has familiarized itself and Contractor's Personnel with Contractor's prevailing permit to work system and procedures pertaining to Site. Contractor acknowledges that it has procured at its own cost and expense that, prior to commencing the Works, Contractor's Personnel have the appropriate permits to carry out the Work.

## 18.  CONTRACT PRICE AND PAYMENT

**18.1** Subject to the provision of the Work in accordance with the terms of the Contract, Company shall pay to Contractor the amounts ascertained in accordance with appendix "Compensation and Payment Schedule" of the Contract.

**18.2** The total price of the Contract is 64,800,000.00 EURO + VAT (sixty four million eight hundred thousand Euros plus Value Added Tax) (or such sum as results from adjustment in accordance with the terms and conditions of the Contract and recorded by a change order issued by Company), inclusive of all taxes (except VAT), duties, customs under whatsoever name ("**Contract Price**") excluding the custom duties that Company is exempted through Exemptions might be applied. The Contract Price is based on the total quantities (Drilling lengths in meters according to Chiren UGS-Updated Geomodel and Forward Development Plan dated July 2023 and number of Wells) stated under this Contract. Parties agree that the Contract Price shall stay the same if the total Drilling length is changed up to (and including) 5% (five percent). If the total Drilling length is changed by more than 5% (five percent) upwards, then respective price per each Well will be calculated pro rata. The Contract Price includes, without limitation, the following: All taxes (excluding VAT and Stamp tax if any stamp tax applicable), labour social security premiums, domestic and international transportation, delivery, and unloading services, materials, equipment, or other items to be used for or in connection with the Works, including but not limited to drawings, manufacturing, delivery inspection, packing and shipping, obtaining licenses and permits which are required for performance of the Works, supervising the installation, test and commissioning of the Works, remedying Defects during Defects Liability Period, provision of any and all spare parts whenever and for whatsoever required, manuals and any other services required for the Works in compliance with the Contract and the Appendices – Matrix of responsibilities and Technical Specifications.

**18.3** After completing related portion of the Work as confirmed by Employer through issuing relevant acceptance documentation to Company, Company will, within 10 (ten) days, either approve or request a revision in the payment certificates. For the





approved portion of such Work, Contractor shall issue invoices on the agreed amounts. The revision approval should be limited to 2 working days.

**18.4** Each invoice shall quote the Contract reference number and title and shall be forwarded, together with adequate backing documentation, including the original or certified copy acceptances, to Company. If Company delays to make payments to Contractor, Contractor shall first notify Company about such delay and the due amount. If Company, after 10 (ten) days from the receipt of such notification has not still made the relevant payment without any valid reason or justification, then Contractor will be entitled to receive the due amount + LIBOR starting from the end of 10 (ten)-day notice period.

**18.5** If Company disputes any item in any invoice, in whole or in part, then Company shall be liable to pay first the invoices amount which is in accordance with approved payment certificate of such invoice until such time as Company and Contractor have reached agreement as to what payment, if any, is due or what other action will be taken by Company in respect of the disputed amount. Company shall promptly notify Contractor of any such disputed amount within 3 days from the receipt of the invoice accompanying with a copy of invoice to Contractor advising the reasons. The non-objection, objection, or payment of any invoice shall not prejudice Company from claiming any paid sums that have not been due in accordance with the Contract.

**18.6** Company and Contractor shall endeavor to settle expeditiously and in good faith, no later than 15 days from the receipt of the invoice, any such dispute and any agreed adjustment and subsequent payment shall be made promptly following the date of such settlement.

**18.7** Company will make payment in EURO currency.

**18.8** Unless otherwise agreed between the Parties in this Contract and except for the costs and expenses expressly or implicitly assumed by the Company, Contractor is deemed to have satisfied itself as to the circumstances (including risks and contingencies) affecting the price for the performance of the Work and/or the cost to Contractor of carrying out the Work and to the correctness and the sufficiency of the rates, lump sum prices and charges specified in the Contract for the Work which shall, except insofar as it is otherwise provided in the Contract, cover all its obligations under the Contract and all matters and things necessary for the proper performance, execution and maintenance of the Work, whether specifically stated in the Contract or not. Contractor's rates, lump sum prices and charges shall include for all costs associated with mechanical and weather down-time, irrespective of severity.

**18.9** 30% (thirty percent) of the Contract Price (**"Advance Payment"**) will be paid, by means of wire transfer upon occurring of all the following conditions:

a. the presentation of the Unconditional Advance Payment Bank Guarantee to be procured by Contractor under the terms of the Contract which has the value of 30 % (thirty percent) of the Contract Price.

b. Company will pay a sum of 21,000,000.00- USD equivalent to 19,440,000.00- EUR (Twenty-one million  United States Dollar equivalent to nineteen million four hundred forty thousand Euros) as Advance Payment within 7 (seven) days from Contractor's submission of its Unconditional Advance Payment Bank Guarantee and invoice.

Unconditional Advance Payment Bank Guarantee. Such Advance Payment Bank Guarantees shall be according to agreed format and content prescribed in "The Advance Payment Bank Guarantee Template". For any further advance payment to be paid to Contractor at Company's sole discretion, an equivalent amount of advance

 

payment bank guarantee to be approved by Company shall be submitted by Contractor to Company before Company makes such advance payment to Contractor.

The Advance Payment Bank Guarantee shall be provided by the following bank: Petefish, Skiles & Co., USA, in accordance with a template confirmed by Company to Contractor in advance. The Advance Payment Bank Guarantee shall be issued as an unconditional irrevocable bank guarantee in favour of Company for a total amount of twenty-one million US dollars (USD 21,000,000.00).

The Advance Payment shall be deducted from the first payment.

**18.10** After timely and duly completion of the mobilization of the Drilling Rigs and all other equipment and material which will be required to complete Drilling of the Wells (which cannot be shorter than 40 days before the first Well spud date as confirmed by Company Representative's notice) the Contractor will invoice the 20 % (twenty percent) of the price for 12 (twelve) Wells, a sum of 11,963,077.00- EURO (eleven million nine hundred sixty-three thousand seventy seven EUROs) as the first payment. This 20 % is calculated based on 50 % minus 30 % (Advance Payment deduction). Company will pay within 10 (ten) days from Contractor's submission of invoice together with a list of its equipment and materials. The 20 % (twenty percent) as a first payment for the remaining 1 (one) Well will be made on mutually agreed time between Company and Contractor, which cannot be later than the last Well's spud date. The remaining of the payment of the Contract Price will be made pro-rata per Well after completion of each Well's subject scope as described here below.

**18.11** 35 % (thirty five percent) of the Contract Price a sum of 22,680,000.00 EURO (twenty two million six hundred eighty thousand Euros) will be made pro-rata per Well after completing the Well Drilling activities and readiness of the execution of test of each Well.

**18.12** 10 % (ten percent) of the Contract Price a sum of 6,480,000.00 EURO (six million four hundred eighty thousand EUROs) will be made pro-rata per Well after the signing of the Provisional Acceptance Certificate (Standard Form 15) for each Well.

**18.13** 5 % (five percent) of the Contract Price a sum of 3,240,000.00 EURO (three million two hundred forty thousand EUROS) will be made pro-rata per Well after signing Final Acceptance Certificate for the Well by the State Acceptance Commission and obtaining a Permit to use the construction site.

**18.14** 75,000 (seventy-five thousand) Euros will be paid additionally to Contract Price when the Contractor's Drilling equipment arrive to Bulgarian Customs.

**18.15** Company shall pay the Advance Payment for the behalf of Contractor to the following bank account held by the leading consortium partner of the Contractor:

- **Bank account holder:** ME-ADS PETROL VE JEOTERMAL SAHALARI HİZMETLERİ SANAYİ VE TİCARET LİMİTED ŞİRKETİ, Turkey

- **Bank account :** 11010170TIB; Beneficiary Account 12051579

- **Beneficiary bank name:** Petefish, Skiles & Co. Bank

- **Bank address:** 102 W. Beardstown Street Virginia, IL 62691

- **Telephone:** (217) 452-3041 Danielle Hone

- **Receiving Bank: TIB**

- **Address of Receiving Bank: 2151 W. White Oaks Drive Suite 100,**






**Springfield, IL 62704**

**18.16 SWIFT**: TIBBUS44Parties agree that such payment when effectuated shall be valid fulfillment of Company's obligation towards Contractor to pay the Advance Payment. Such payment shall not release anyhow Contractor from its obligations and liabilities under the Agreement.

**18.17** Parties shall agree in advance in writing about the bank account to which next payments shall be made to Contractor.

## 19. GUARANTEES

### 19.1 Advance Payment Bank Guarantee

**19.1.1** Contractor shall provide the Advance Payment Bank Guarantee in accordance with Clause 18.9, which shall be valid for a period of at least 12 months after the Effective Date. Provided that the spud of the first Well does not occur for whatever reason within 11 months after the Effective Date, Contractor shall extend the Advance Payment Bank Guarantee by at least 6 months, ensuring there is no gap in the validity thereof.

**19.1.2** Company will approve reduction of the Advance Payment Bank Guarantee amount to Contractor upon occurrence of the following conditions:

    (i)    Company shall provide to Contractor a written approval for reduction of the Advance Payment Bank Guarantee by an amount of ten million US dollars (USD 10,000,000.00) if Contractor has duly delivered in Bulgaria Deliverables the insurance value of which is equal to or higher than the said herein amount of reduction by 31 January 2024.

    (ii)    Company shall provide to Contractor a written approval for reduction of the Advance Payment Bank Guarantee by an amount of six million US dollars (USD 6,000,000) if Contract has duly delivered in Bulgaria further Deliverables the insurance value of which is equal to or higher than the said herein amount of reduction by 28 February 2024.

    *(iii)*    Company shall provide to Contractor a written approval for a final release of the Advance Payment Bank Guarantee for all outstanding amount thereunder if and after all of the following conditions have been met:

        a.    All Deliverables for all Wells, the two Drilling Rigs, and all other Contractor's Materials necessary for the spud of the first Well, have been Mobilzed on Site in due time;

    (iv)    Contractor has provided a Performance Guarantee as per Clause 19.2 below; and

    (v)    Contractor is operationally ready to spud the first Well.

If the above conditions under point (iii) are met, Company shall return the Advance Payment Bank Guarantee on the same date when the last conditions is met.

### 19.2 Performance Guarantee

**19.2.1** Upon receipt of the First Payment and before the spud of the first Well, Contractor shall provide to Company a Performance Guarantee, in the form of an unconditional bank guarantee according to the agreed format and content prescribed in "The Performance Bank Guarantee Template" and agreed by both Parties' banks.

**19.2.2** The Performance Guarantee shall be in the amount of 5% of the Contract Price and shall be maintained valid until the Completion of the last Well. Upon Completion of




the last Well Company shall return the Performance Guarantee to Contractor.

**19.2.3** Company shall have the right to withdraw the Performance Guarantee in all cases of Contractor's liability to Company under or in relation to the Contract, without prejudice to Company's rights to seek full compensation of its rights and interests in relation to the Contract.

**19.3** The issuing bank(s) of the Advance Payment Bank Guarantee and the Performance Guarantee shall be corresponding bank(s) of Company's bank.

## 20.  LIABILITIES AND INDEMNITIES

**20.1** Subject to and without prejudice to Clause 20.6 – 20.8 below, Contractor shall defend, indemnify and hold harmless and shall ensure that its Subcontractors and Contractor Group defend, indemnify and hold harmless Company and Company Group from and against any and all Claims caused by Contractor's fault, negligent acts, error or omissions arising out of or in the course of or by reason of the carrying out of the Works.

**20.2** Subject to and without prejudice to Clauses 20.3 - 20.5 below, Company shall defend, indemnify and hold harmless and shall ensure that Company Group defend, indemnify and hold harmless Contractor and Contractor Group from and against any and all Claims caused by Company's fault, negligent acts, error or omissions arising out of or in the course of or by reason of the performance of Company's rights and obligations under the Contract.

**20.3** CONTRACTOR WAIVES ALL RIGHTS OF RECOURSE AGAINST AND SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS COMPANY GROUP, AND SHALL ENSURE THAT ITS SUBCONTRACTORS AND CONTRACTOR GROUP WAIVE ALL RIGHTS OF RECOURSE AGAINST AND SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS, COMPANY GROUP FROM AND AGAINST ANY AND ALL CLAIMS, IRRESPECTIVE OF CAUSE AND NOTWITHSTANDING THE NEGLIGENCE, GROSS NEGLIGENCE, BREACH OF DUTY (STATUTORY OR OTHERWISE) OR OTHER FAILURE OF ANY NATURE OF THE COMPANY GROUP:

**20.3.1** IN RESPECT OF LOSS OF OR DAMAGE (INCLUDING REMOVAL OF WRECK AND/OR DEBRIS) TO CONTRACTOR'S MATERIALS AND CONTRACTOR GROUP'S PROPERTY AND EQUIPMENT;

**20.3.2** IN RESPECT OF BODILY INJURY, DEATH, SICKNESS, DISEASE OF ANY CONTRACTOR GROUP'S PERSONNEL OR LOSS OF OR DAMAGE TO THEIR PROPERTY.

**20.4** CONTRACTOR SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS, AND SHALL ENSURE THAT ITS SUBCONTRACTORS AND CONTRACTOR GROUP SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS COMPANY GROUP FROM AND AGAINST ANY CLAIM IN RESPECT OF LOSS OR DAMAGE (INCLUDING CONSEQUENTIAL LOSS), BODILY INJURY, DEATH, SICKNESS, DISEASE, CAUSED TO ANY THIRD PARTY BY CONTRACTOR GROUP OR BY CONTRACTOR'S MATERIALS OR CONTRACTOR GROUP'S PROPERTY AND EQUIPMENT, AND ARISING OUT OR IN RELATION TO THE PERFORMANCE, MIS-PERFORMANCE OR NON-PERFORMANCE OF THE CONTRACT.

**20.5** WITHOUT PREJUDICE TO THE GENERALITY OF THE FOREGOING CLAUSE 20.4, CONTRACTOR SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS, AND SHALL ENSURE THAT ITS SUBCONTRACTORS AND CONTRACTOR GROUP SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS COMPANY GROUP FROM AND AGAINST ANY CLAIM IN RESPECT OF LOSS OR DAMAGE (INCLUDING THE COST OF REMEDIAL

 

MEASURES), BODILY INJURY, DEATH, SICKNESS, DISEASE, CAUSED TO THIRD PARTY BY THE DISCHARGE OF ANY SUBSTANCE, TO THE EXTENT SUCH DISCHARGE IS CAUSED BY CONTRACTOR'S MATERIALS OR CONTRACTOR GROUP'S PROPERTY AND EQUIPMENT OR BY ANY ACT, OMISSION OR THE NEGLIGENCE OR BREACH OF DUTY (STATUTORY OR OTHERWISE) OF CONTRACTOR GROUP, AND EXCEPT WHERE SUCH DISCHARGE HAS BEEN MADE UPON WRITTEN INSTRUCTION OF THE COMPANY'S REPRESENTATIVE STIPULATED IN THE CONTRACT.

**20.6** COMPANY SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS CONTRACTOR GROUP, AND SHALL ENSURE THAT COMPANY GROUP WAIVE ALL RIGHTS OF RECOURSE AGAINST AND SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS, CONTRACTOR GROUP FROM AND AGAINST ANY AND ALL CLAIMS, IRRESPECTIVE OF CAUSE AND NOTWITHSTANDING THE NEGLIGENCE, GROSS NEGLIGENCE, BREACH OF DUTY (STATUTORY OR OTHERWISE) OR OTHER FAILURE OF ANY NATURE OF THE CONTRACTOR GROUP:

**20.6.1** IN RESPECT OF LOSS OF OR DAMAGE (INCLUDING REMOVAL OF WRECK AND/OR DEBRIS) TO COMPANY'S MATERIALS AND COMPANY GROUP'S PROPERTY AND EQUIPMENT;

**20.6.2** IN RESPECT OF BODILY INJURY, DEATH, SICKNESS, DISEASE OF ANY COMPANY GROUP'S PERSONNEL OR LOSS OF OR DAMAGE TO THEIR PROPERTY

**20.7** COMPANY SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS, AND SHALL ENSURE THAT COMPANY SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS CONTRACTOR GROUP FROM AND AGAINST ANY CLAIM IN RESPECT OF LOSS OR DAMAGE, BODILY INJURY, DEATH, SICKNESS, DISEASE, CAUSED TO ANY THIRD PARTY BY COMPANY GROUP OR BY COMPANY'S MATERIALS OR COMPANY GROUP'S PROPERTY AND EQUIPMENT, AND ARISING OUT OF IN RELATION TO THE PERFORMANCE, MIS-PERFORMANCE OR NON-PERFORMANCE OF THE CONTRACT AND/OR THE MAIN CONTRACT.

**20.8** WITHOUT PREJUDICE TO THE GENERALITY OF THE FOREGOING CLAUSE 20.7, COMPANY SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS, AND SHALL ENSURE THAT COMPANY GROUP SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS CONTRACTOR GROUP FROM AND AGAINST ANY CLAIM IN RESPECT OF LOSS OR DAMAGE (INCLUDING THE COST OF REMEDIAL MEASURES), BODILY INJURY, DEATH, SICKNESS, DISEASE, CAUSED TO THIRD PARTY BY THE DISCHARGE OF ANY SUBSTANCE, TO THE EXTENT SUCH DISCHARGE IS CAUSED BY COMPANY'S MATERIALS OR COMPANY GROUP'S PROPERTY AND EQUIPMENT OR BY ANY ACT, OMISSION OR THE NEGLIGENCE OR BREACH OF DUTY (STATUTORY OR OTHERWISE) OF COMPANY GROUP.

**20.9** Notwithstanding the above waivers of recourse, all liabilities, exclusions, and indemnities given under the Contract shall not apply in the case of the willful misconduct of the indemnified Group.

**20.10** Parties shall not be relieved from their liabilities under the Contract and shall be fully responsible for the consequences of the acts and omissions of their personnel, agents, Subcontractors or Subcontractors' personnel.

**20.11** For the purposes of this Clause 20 "third party" shall mean any party which is not a member of the Contractor Group or the Company Group.

**20.12** Whenever a Party or any other member of Company Group or Contractor Group is pursued in respect of any loss, damage, personal and bodily injury, including death,



ì-7





sickness or disease, caused whatsoever for which the other Party is liable under the provisions of the Contract, the latter shall defend, indemnify and hold harmless the former.

**20.13** Whenever a Party or any member of Company Group or Contractor Group is obliged or held responsible to pay, pursuant to a judgement or an arbitration award, a sum for which Company or Contractor respectively is liable under the provisions of the Contract, the latter shall reimburse and indemnify the former without delay.

**20.14** The provisions of this Clause 20 shall survive the termination or expiration of the Contract.

## 21. CONSEQUENTIAL LOSS

For the purposes of this Article 21 the expression "**Consequential Losses**" shall mean:

(i) Consequential, or indirect losses under English law; and/or

(ii) Loss or deferral of production, loss of product, loss of revenue, facility downtime, loss of profit or anticipated profit (if any), loss of data, loss of or inability to use property and equipment, loss of commercial activity, loss of goodwill, loss of opportunity, loss of reputation or business interruption, failure to meet other contractual commitments (except in the case of the Back-to-Back Principle with the Main Contact) or deadlines or downtime of vessels, howsoever same may be caused and whether or not any of the foregoing are direct, consequential or indirect losses and whether or not foreseeable at the date of the Contract.

(iii) Notwithstanding anything to the contrary in this Contract, neither Party shall be liable to the other Party (or any member of the other Party's Group) for, and each Party hereby releases and agrees to indemnify the other Party from and against, any and all Claims for Consequential Losses, REGARDLESS OF THE CAUSE OR CAUSES THEREOF, INCLUDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE (IN ANY AMOUNT), GROSS NEGLIGENCE OR WILFUL MISCONDUCT, STRICT LIABILITY, BREACH OF WARRANTY, BREACH OF DUTY (STATUTORY OR OTHERWISE), BREACH OF CONTRACT, OR ANY OTHER LEGAL FAULT, LIABILITY, OR RESPONSIBILITY OF ANY MEMBER OF COMPANY GROUP OR CONTRACTOR GROUP

## 22. INSURANCE

**22.1** The Contractor shall arrange as a minimum the following insurances:

**22.1.1** professional liability insurance according to article 171 of Bulgarian Spatial Planning Act, to be in full force and effect from 10 days after Effective Date until the Completion of the Work; and

**22.1.2** all Contractor's Materials will be insured until Completion of the Work.

**22.2** The Contractor shall supply the Company with evidence of such insurances on demand which must be signed by a duly authorized representative of the insurance company or underwriters or insurance brokers issuing such policy or policies and evidence the coverages, limits, endorsements and extensions.

**22.3** The Contractor shall procure that Subcontractors are insured to appropriate levels as may be relevant to their work.

## 23. CONFIDENTIALITY

**23.1** For the purposes of the Contract, the term 'Confidential Information' includes such non-public information which is disclosed by either party to the other party, whether







or not marked confidential, and which includes inter alia, business policies or practices, business plans, dealings, customer lists or requirements, price lists or pricing structures, technical data, employee or officers' data, product lines, designs, research and development activities and findings, ideas, concepts, know-how, financial statements and other non-generic information whether tangible or intangible, written or oral, relating to any released or unreleased concepts, ideas, projects and services, the marketing or promotion of products and any other information received from any source which would be deemed as confidential or proprietary.

**23.2** All information concerning Disclosing Party's activities obtained by Receiving Party in the course or conduct of the Works hereunder and all information or data otherwise furnished to one Party by other Party shall be considered confidential and shall not be disclosed by the Party to any third party without the prior written consent of other Party or used by the Parties for any purpose other than carrying out the Works.

**23.3** Receiving Party hereto shall, save as otherwise provided herein, maintain in strict confidence, and not disclose or use for a purpose other than the purpose set out herein, any Confidential Information including the Contract and the terms and conditions hereof. The foregoing covenant shall not restrict a Party from disclosing Confidential Information to the extent required in connection with any legal proceeding(s) or required for filing with governmental agencies, courts, stock exchanges or other regulatory agencies under Applicable Laws and regulations. Whereupon such Confidential Information is to be disclosed, the Party shall promptly take written consent of other Party, which shall not be unreasonably withheld.

**23.4** The Party shall restrict access to the Confidential Information only to its own employees or professional advisers who need to have such access for the purposes of performing the obligations or enforcing the rights under the Contract and who have agreed with such Party to abide by the obligations of confidentiality equivalent to those contained herein with such Party. The disclosing Party shall remain vicariously liable for such disclosure.

**23.5** Parties acknowledge and accept that the information shared by Disclosing Party is confidential and Receiving Party shall maintain, protect and not disclose such Confidential Information for a period of 5 (five) years unless it is already public or the disclosure is requested by a governmental body.

**23.6** Each Party agrees that it will not use the title or logo of the other Party, without the prior written consent of the other Party(ies) hereto.

## 24. CONTRACTOR'S PROPRIETARY INFORMATION

**24.1** Company undertakes to keep confidential all techniques, know-how, methods and processes which are the property of or are proprietary to Contractor. Company shall also treat as confidential and shall not, without Contractor's prior written consent, disclose to any third party any other information which is clearly marked as confidential by Contractor.

### 24.2 Exclusions

The provisions of Clause 23 and Clause 24.1 shall not apply to information which:

    **i.**    is part of the public domain; or

    **ii.**    was in the possession of the relevant Party prior to the commencement of negotiations on the Contract and which was not subject to any obligation of confidentiality owed to the other Party; or

i—1




iii.  was received from a third party whose possession is lawful and who is under no obligation not to disclose; or

iv.  is required to be disclosed in order to comply with the requirements of any law, rule or regulation of any governmental or regulatory body having jurisdiction over the Works or the relevant Party, or of any relevant stock exchange; or

v.  is required to be disclosed to Employer in full accordance with the Main Contract and Technical Specifications

## 25.  ACCESS AND AUDIT

**25.1** Contractor shall keep full and complete accounts and records. Such accounts and records shall be prepared in accordance with the Applicable Laws and generally accepted accounting principles.

**25.2** For the purposes of audit, Company shall have the right to examine, in the offices of Contractor, or at the Site, during business hours and for a reasonable length of time, records, correspondence, instructions, specifications, plans, drawings, receipts and memoranda insofar as they are pertinent to the Contract.

## 26.  FORCE MAJEURE

**26.1** Neither Company nor Contractor shall be responsible for any failure to fulfil any term or condition of the Contract if and to the extent that fulfilment has been delayed or temporarily prevented by a Force Majeure occurrence, as hereunder defined, which has been notified in accordance with this Clause. Both Parties shall use their best endeavors to mitigate or overcome the circumstances of Force Majeure.

**26.2** For the purposes of the Contact, an event shall be accepted as force majeure event ("**Force Majeure**") under the Contract if: (i) such event cannot be avoided even though the relevant affected Party has shown necessary effort and care and has taken necessary measures and (ii) if such event significantly or entirely affects in a negative manner fulfilment of the relevant affected Party's obligations under the Contract in terms of time and/or cost (iii) such event is beyond control and without the fault or negligence of the Party affected (iv) by the exercise of reasonable diligence, the said Party is unable to provide against. Within the framework of such principles, circumstances that shall be accepted as Force Majeure are limited to the following:

i.  War, civil riot, fire and riot, war, invasion, act of foreign enemy, hostilities (whether war be declared or not), act of terrorism, civil war, rebellion, revolution, insurrection of military or usurped power;

ii.  Ionizing radiation or radioactive contamination from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel or radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

iii.  Act of God, floods, earthquake, flood, fire, explosion and/or other natural physical disaster, but excluding weather conditions as such, regardless of severity;

iv.  Strikes or industrial disputes at a national or regional level that affect a substantial or essential portion of the Work or industrial disputes by labour not employed by the Effected Party its subcontractors or its suppliers and which affect a substantial or essential portion of the Goods or/and Work;

v.  Maritime or aviation disasters that affect a substantial or essential portion of the Work.



i-7





**vi.** Changes to any general or local Statute, Ordinance, Decree, or other Applicable Law, or any regulation or by-law of any local or other duly constituted authority or the introduction of any such Statute, Ordinance, Decree, Law, regulation or bye-law, or restrictions imposed by or other acts, omissions, or delays (when not caused by either Party's breach of Contract or Applicable Law) of any governmental body or authority.

**26.3** In the event of a Force Majeure occurrence, the Party that is or may be prevented in performing its obligations under the Contract shall notify the other Party not later than 24 (twenty-four) hours giving the full particulars thereof and shall use all reasonable endeavors to remedy the situation without delay. The said Party shall notify the other Party not later than 24 (twenty-four) hours after the Force Majeure situation has been remedied and normalcy has been restored.

**i.** Unless otherwise specified in the Contract, Contractor shall not be entitled to any payment in respect of any period where the Works are not carried out as a result of Force Majeure. The time for performance required of the affected party shall be extended by the period of such delay provided the party is exercising diligent efforts to overcome the cause of such delay

**ii.** In the event that a Force Majeure condition prevails for a period of 30 (thirty) consecutive days then Company and Contractor may terminate the Contract forthwith by giving notice. In case Company does not elect to terminate the Contract after 30 (thirty) consecutive days, then the Parties shall seek a basis for agreement on a way forward in order for resumption of performance.

## 27.  PERSON RESPONSIBLE FOR PAYMENT OF TAXES

**27.1** The Contract Price specified is inclusive of all applicable taxes and duties. Contractor shall be responsible for and pay when due all taxes and duties relating to the Work including, without limitation:

**i.** The payment of all taxes now or hereafter levied or imposed on Contractor or its Subcontractors or on the personnel of Contractor or its Subcontractors by any Governmental Authority in respect of any wages, salaries and other remuneration paid directly or indirectly to persons engaged or employed by Contractor or its Subcontractors (hereinafter referred to as **"Personal Income Tax"**);

**ii.** The payment of all taxes now or hereafter levied or imposed by any Governmental Authority on the actual/assumed profits and gains made by Contractor or its Subcontractors (hereinafter referred to as **"Corporate Income Tax"**);

**27.2** Contractor and Company shall use its best efforts to minimize any costs due to the application of import and customs duties by applying for and obtaining all available exemptions, and shall use reasonable diligence in resisting the application of import and customs duties on Contractor's Materials and other materials under the Contract.

**27.3** All taxes levied on Contractor's corporate income or profits shall be for the account of Contractor and shall not be reimbursed by Company.

## 28.  PROVISIONAL ACCEPTANCE AND FINAL ACCEPTANCE

### 28.1 Provisional Acceptance

**28.1.1** Upon completion of any Well in compliance with the requirements of the Contract, Applicable Laws, Best Industry Practice and international standards, Contractor shall apply to Company in order for Employer to conduct necessary

i-7



tests and inspections on the said Well for acceptance.

**28.1.2** In case the relevant Well is in compliance with the requirements of the Contract and passes such tests and inspections as required by Employer, within 10 days Employer shall issue a Provisional Acceptance Certificate for the relevant Well, which means signing of a Protocol Standard Form 15 according to Applicable Laws.

### 28.2 Final Acceptance

**28.2.1** Upon completion of the Well in compliance with the requirements of the Contract, Applicable Laws, Best Industry Practice and International standards, Contractor shall apply to Company for Employer to conduct necessary tests and inspections on the said Well for acceptance and to issue the Final Acceptance which means Protocol Standard form 16 according to Applicable Law.

**28.2.2** In cases the Wells to be handed over pass the tests and inspections carried out by Employer, Employer will issue the Final Acceptance Certificate. If Final Acceptance Certificate is not issued within 60 (sixty) days from the date of the Provisional Acceptance Certificate, the Provisional Acceptance Certificate will be considered as Final Acceptance for the relevant Well for payment purposes and Contractor and Company mutually agree to perform necessary test on suitable time, which means to follow acceptance of the relevant Well by the State Acceptance Commission and obtaining a Permit to use the construction site.

## 29. TERMINATION

### 29.1 Termination For Cause

**29.1.1** Company shall be entitled to terminate the Contract with immediate effect in case of occurrence of the following events with being obliged to pay the mutually agreed Project cost which includes materials and equipment already purchased or ordered (ownership will be delivered to Company), and also for the completed Work's.

    **a.** If bankruptcy, insolvency, moratorium, or similar debtor-relief proceedings are commenced in relation to Contractor.

    **b.** If any event of default or similar circumstances occur under the requiring termination of the Contract, which is consequent on a breach or default of Contractor under the Contract.

    **c.** If Contractor or a Subcontractor receives, gives or offers to give a corrupt gift or payment and the corrupt nature of such gift or payment is determined by any order or decree of any competent court;

**29.1.2** The occurrence of any one or more of the following events shall, if Contractor after having been notified by Company of such event has not remedied such event within the period instructed by Company, constitute a Contractor's default (**"Contractor's Default"**) by Contractor hereunder:

    **a.** Contractor fails to Mobilise and deliver all the materials/tangibles necessary for the spud of the Wells including casing, tubing, wellheads as per Clause 4.6.

    **b.** If Contractor is in breach of any of its obligations under the Contract;

    **c.** If Contractor's Materials, Wells and/or Works fail to achieve the requirements set out in the Contract;



**d.** If Contractor fails to obtain or maintain any permit and/or license for which it is responsible under the provisions of the Contract;

**e.** If Contractor fails to correct any Defect within the period to be notified by Company at its sole and absolute discretion.

**f.** If Contractor does not submit all updated and detailed documents to be produced by Contractor within the timeline stipulated in the Contract or within the time period to be notified by Company.

In the case of Contractor's Defaults under Clause 29.1.2a the Company is entitled to terminate the Contract and request reimbursement of the Advance Payment. If Contractor does not issue reimbursement of the Advance Payment in 7 days, the Company is entitled to retrieve the Advance Payment via the Advance Payment Bank Guarantee after subtracting the executed and accepted part of the Advance Payment to the Contractor.

**29.1.3** In case of occurrence of any of the events set forth above in Clause 29.1.1 or 29.1.2, Company, without prejudice to any remedy provided herein or otherwise available at Applicable Laws or in equity, may, by written notice to Contractor, terminate the Contract and shall be entitled to compensation equal to 10 % of the Contract Price to be paid to Company by Contractor.

**29.1.4** Within 30 (thirty) days or reasonable time for exporting the remaining Contractor's Materials, following the termination of the Contract pursuant to this Clause 29.1, Contractor shall Demobilize from the Site. Contractor shall return any surplus of Company's Materials to Company as operational and in a good condition as provided to Contractor for the performance of the Works, excluding normal wear and tear.

## 29.2 Termination for Convenience by Company

**29.2.1** Company, at its sole discretion, may terminate the Contract, in whole or in part, for any reason at any time by 60 (sixty) days prior written notice thereof to Contractor (any such termination, a **"Termination for Convenience"**). Upon receipt of any such notice, Contractor shall, unless the notice directs otherwise:

**a.** immediately discontinue to perform the Works on the date and to the extent specified in such notice;

**b.** undertake no further commitments and place no further orders or subcontracts for equipment or Works except as may be necessary for completion of such portion of Works as is not discontinued;

**c.** if applicable, deliver to the Site, or such other location as Company may instruct, all Contractor's Materials, Wells and/or Works components, materials and other equipment related to the Works for which payments have been already made under the Contract;

**d.** promptly make every effort for cancellation of procurement upon terms satisfactory to Company of all commitments, orders, subcontracts and other agreements to the extent they relate to the performance of manufacture the Works that is discontinued; and

**e.** thereafter execute only that portion of the Works as is not discontinued and that portion of Works as may be necessary to preserve and protect Works already in progress, to protect Contractor's Materials, Company's Materials and the Wells at the Site or in transit thereto and to deliver Contractor's Materials and Wells in transit safely and quickly to the Site.




**f.**   unless otherwise specified by Company in the notice of termination, remove all equipment from the Site and repatriate Contractor's and its Subcontractors' personnel from the Site, remove from the Site any wreckage, rubbish and debris of any kind and leave the whole of the Site in a clean and safe condition;

**g.**   to the extent legally possible, procure the assignment to Company or such person as Company may direct, of all rights, title and benefit of Contractor to the Works as at the date of termination, and, as may be required by Company, in any subcontracts between Contractor and its Subcontractors;

**h.**   procure, insofar as legally, reasonably and commercially possible, that any permits and licenses obtained in connection with the Contract are transferred into the name of Company or as Company may direct; and

**i.**   deliver to Company all documents prepared by Contractor or its Subcontractors as at the date of termination in connection with the Works.

As Contractor's remedy for such Termination for Convenience, Company shall pay to Contractor all payments due and unpaid relating to Work performed in accordance with the Contract by Contractor before the Termination for Convenience immediately, plus additionally 10 % of the Contract Price, which should be made within 10 (Ten) days after Company receives an invoice from Contractor.

**29.2.2** Within 30 (thirty) days following the Termination for Convenience of the Contract pursuant to this Clause, Contractor shall Demobilize from the Site and return to Company all surplus of Company's Materials operational and in a good condition as provided to Contractor for the performance of the Works, excluding normal wear and tear.

### 29.3 Termination Due to Force Majeure

In case that a Force Majeure event prevails for a period of 30 (thirty) consecutive days then Company may terminate the Contract forthwith by giving notice to Contractor.

**29.3.1** Within 30 (thirty) days or reasonable time for exporting the remaining Contractor's Materials, following the termination of the Contract pursuant to Clauses, Contractor shall Demobilize from the Site and return any surplus of Company's Materials to Company as operational and in a good condition as provided to Contractor for the performance of the Works, excluding normal wear and tear.

**29.4** Company warrants that it shall not illegally seize or impede the duly Demobilization of those Contractor's Materials that exclude Deliverables. In confirmation of this obligation, Company shall provide, upon completing the Mobilization of such Contractor's Materials, to Contractor an agreed bank letter covering the insurance value of such Contractor's Materials.

### 30. SUSPENSION

**30.1** In case of suspension of the Project and/or section of the Project under the Main Contract by Employer, the Contract shall also be suspended for the period during which the respective section of the Project under the Main Contract is suspended. In this case, Contractor shall be entitled to compensation of the losses, damages, costs and/or expenses in this regard which will be mutually agreed.



i-7





**30.2** In case of suspension of the Project and/or section of the Project under the Main Contract by Company for any reason whatsoever including due to Employer's failure to pay Main Contract's price to Company, the Contract shall also be suspended for the period during which the respective section of the Project under the Main Contract is suspended. In this case, Contractor shall be entitled to compensation of the losses, damages, costs and/or expenses in this regard which will be mutually agreed.

**30.3** Company may, at its sole discretion, suspend the Works or part of the Works under the Contract for any reason at any time. Upon receipt of a notice for suspension by Company, Contractor shall immediately suspend the Works or the part of the Works as the case may be. In this case the suspension under this Clause qualifies as Stand-By. Free of Charge Stand-by Period shall apply in total of 48 (forty-eight)-hour period per Rig, whereafter Contractor will be entitled to receive Stand-By Cost of 75,000-EURO (Seventy-five thousand Euros) per day per Rig for the Stand-By period.

**30.4** If it is proven that the Suspension is due to Contractor's breach of the legal requirements, Company has the right with a written notice to suspend the Work, in such case the compensation under Clause 30.1 and 30.2 and the Stand-By Cost under 30.3 shall not be due.

## 31. STATUS OF COMPANY AND CONTRACTOR

Contractor shall act as an independent Contractor and not as an agent of Company in the performance of the Contract and nothing contained herein or contained in any agreement between Contractor and any other Company, corporation or entity of any tier shall create any such relationship with Company. Furthermore, under no circumstances shall the employees, or any of them, of Contractor or any Subcontractor be deemed to be employees of Company.

### 31.1 Subcontractors

Contractor shall not subcontract the whole of the Works to any Subcontractor without approval of the Company. Contractor shall be responsible for the acts or defaults of any Subcontractor, his agents or employees, as if they were the acts or defaults of Contractor.

The Contractor herewith acknowledges and undertakes to subcontract the respective work scopes to reputable Service companies which has to be approved by the Company in advance for each particular case.

While Contractor subcontracts services, depending on their performance or new technology availability, Contractor may change some of its Subcontractors with same or better service and/or performance quality in order to timely and duly deliver the Work to Company.

Contractor undertakes to sign necessary subcontracts with the Subcontractors before starting the Drilling operation.

## 32. REPRESENTATIVES

**32.1** For the purposes of the Contract, Company's Representative for contractual, operational and technical matters shall be Maya Pencheva, Legal nominated representative of UGS Drilling Chiren DZZD and Contractor's Representative for contractual, operational and technical matters shall be İsmet Yücetaş/General Manager. Copies of all contractual, operational and technical communications shall be sent to Company's and Contractor's Representative. Parties shall notify each other in case and before they make a change in their respective representatives.

**32.2** Company's Representative shall communicate to Contractor all information,





instructions and decisions of Company. All information, instructions and decisions issued by Company's Representative shall be deemed to have been issued by Company.

**32.3** Company's Representative may, from time to time, delegate any responsibilities to any nominated deputy and withdraw any such delegation. The terms of such delegation shall be the subject of a notice to Contractor. Information, instructions and decisions issued by any nominated deputy, acting within the terms of his delegated authority, shall be as if issued by Company's Representative.

**32.4** Contractor's Representative shall be authorized to act on behalf of Contractor in all matters relating to the Contract and any written order, instruction or notice from Company to Contractor's Representative shall be deemed to have been given to Contractor.

### 33. BUSINESS ETHICS

**33.1** Contractor shall at all times perform the Contract in a lawful manner consistent with the most recently updated and highest standards in the relevant sector/industry. Contractor shall not at any time enter into any arrangement with personnel, officers or agents of Company or its Affiliates or Employer without Company's prior written approval.

**33.2** In conducting its business, Contractor shall not, at any time, either directly or indirectly, in the name of, on behalf of, or for the benefit of Company, its Affiliates, offer, pay, promise to pay, or authorize the payment of any money and/or gift, or offer, give, promise to give, or authorize the giving of anything of pecuniary value or otherwise to (a) any official, employee, agent, or representative of any Governmental Authority; (b) any political party or official thereof, or to any candidate, nominated or otherwise, for political office; or (c) any official, employee or agent of Company, its Affiliates; in each case for the purpose of influencing any act or decision of such official, employee, agent, party, or candidate or inducing such official, employee, agent, party, or candidate to do or omit to do any act in violation of the lawful duty of such official, employee, agent, party, or candidate, or securing any improper advantage for or otherwise promoting the business interests of Contractor in any way. Contractor shall require each of its directors, officers, employees, agents, consultants, Subcontractors and suppliers to comply with the provisions of this Clause.

**33.3** The Company will not directly communicate, hire or cooperate with Contractor's Subcontractors which is selected by Contractor and approved by Company for any scope of works for 24 months.

### 34. LANGUAGE

**34.1** The language of the Contract is English. Notwithstanding the foregoing, Parties agree that the English version of the Contract shall prevail if there are any other versions.

**34.2** The English language shall be used throughout in Contractor's communications, reports, minutes, correspondence, drawings, specifications, calculations and invoices submitted to Company.

**34.3** All meetings attended by Company shall be conducted in English.

### 35. PUBLICITY AND PRESS ANNOUNCEMENTS

Contractor shall obtain written consent from Company prior to making press releases or announcements regarding either the Contract or the activities of Contractor related to its participation in the Contract and shall ensure that any Subcontractor also





complies with this requirement.

### 36. COMPLIANCE WITH LAW

**36.1** Contractor acknowledges and accepts to comply with all Applicable Laws, international regulations and Company' and Employer's reasonable requirements related with HSE as well as QA/QC requirements.

**36.2** Contractor shall not under any circumstances apply to, or enter into negotiations, or agree with any Governmental Authority or agency for acceptance of variations from or revisions to Applicable Laws without Company's prior written consent except to the extent such matters pertain only to Contractor's Materials and/or Contractor's Personnel and do not and cannot directly and/or indirectly affect the Works and the Project.

### 37. GOVERNING LAW AND DISPUTE RESOLUTION

**37.1** This Contract, and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation, shall be governed by, and construed in accordance with, the laws of England and Wales.

**37.2** Any dispute arising out of, relating to, or in connection with the Contract, including any question regarding its existence, validity, or termination shall be first endeavoured to be resolved by agreement amicably, expeditiously and in good faith between the Parties.

**37.3** In the event that Parties cannot amicably resolve the dispute as prescribed by this Clause, then such dispute shall be referred to London Court of International Arbitration ("**LCIA**") in accordance with LCIA Arbitration Rules.

    (a) The Place of Arbitration shall be London, UK.

    (b) The Arbitration shall be conducted in the English Language.

    (c) There shall be three arbitrators, appointed as follows. Within twenty (20) days after the request for arbitration, each party shall select one person to act as arbitrator and within twenty (20) days of their selection, the two selected shall select a third arbitrator. If any arbitrators are not selected within these time periods, the arbitrator(s) not so selected will be chosen in accordance with the LCIA Arbitration Rules. The Parties agree to expedite arbitration.

### 38. NOTICES

**38.1** Parties agree, declare and undertake that their (i) full mail; (ii) e-mail and (iii) registered electronic mail addresses given below are their statutory notification addresses for the purposes of all kinds of notification including all notices and warnings to be served per the provisions of the Contract in relation with the matters originating from the Contract and/or the annexes hereto:

| **COMPANY** | | | |
|---|---|---|---|
| (a) | Trade Name | : | UGS Drilling Chiren DZZD |
| (d) | Registered Tax Office | : | Sofia Municipality |
| (e) | Tax Identity Number | : | BG180918644 |



i-7




| (f) | Full Mail Address | : | Str. Damyanitsa 3-5, City of Sofia, Post Code 1619, Bulgaria |
| (g) | E-Mail Address | : | gbs-sofia@gbs-sofia.com |
| (h) | Electronic Mail Address For Notification Purposes | : | ugsdrilling@gbs-bg.com |

| **CONTRACTOR** | | | |
| (a) | Trade Name | : | MEADS-MAES USA CHIREN JOINT VENTURE COMPANY |
| (d) | Registered Tax Office | : | 3 Ogneborets St., City of Sofia, Post Code 1619, Bulgaria |
| (e) | Tax Identity Number | : | 181043220 |
| (f) | Full Mail Address | : | 3 Ogneborets St., City of Sofia, Post Code 1619, Bulgaria |
| (g) | E-Mail Address | : | y.ismet@me-ads.com |
| (h) | Electronic Mail Address For Notification Purposes | : | y.ismet@me-ads.com |

**38.2** Each Party agrees, declares, and undertakes to notify to the other Party changes in their statutory notifications addresses indicated herein at least 15 (fifteen) days in advance in compliance with the provisions of the Contract and in writing, otherwise, notification made to their statutory notification address indicated herein shall bear all effects and consequences of a legally valid notification duly served starting from the date of such notification.

## 39. ENTIRE CONTRACT

The Contract constitutes the entire agreement between the Parties with respect to the subject matter of the Contract and supersede any and all previous commitments, agreements or arrangements or contracts (whether oral or written) with respect thereto prior to the Signature Date.

## 40. WAIVER

**40.1** No waiver by either Party of any default by the other in the performance of any of the provisions of the Contract shall; (i) operate or be construed as a waiver of any other or further default whether of a like or different character; or (ii) be effective unless in writing duly executed by an authorized representative of the non-defaulting Party.

**40.2** The failure by either Party to insist on any occasion upon the performance of the terms, conditions or provisions of the Contract or time or other indulgence granted by one Party to the other shall not thereby act as a waiver of such breach or acceptance of any variation.



 

### 41. AMENDMENTS

Any amendment to, modification of, or alteration to the Contract, shall not be valid and shall not be binding upon the Parties unless the same shall be executed in writing respectively by duly authorized representatives of the Parties.

### 42. SEVERABILITY

If any provision of the Contract is held to be invalid or unenforceable, then such provision shall (so far as it is invalid or unenforceable) be given no effect and shall be deemed not to be included in the Contract but without invalidating any of the remaining provisions of the Contract. The Parties shall be liable to make their ultimate best efforts objectively to insert a replacing provision similar to such invalid provision the effect of which is as close as possible to the intended effect of the invalid and unenforceable provision.

### 43. ASSIGNMENT

Contractor shall not assign its rights or delegate its duties under the Agreement to any other third party without the prior written authorisation from Company, and any purported assignment or delegation without such authorisation will be null and void.

### 44. THIRD PARTY RIGHTS

No provision of this Contract shall be enforceable by any third party under the Contracts (Rights of Third Parties) Act 1999 or otherwise, unless otherwise expressly provided herein.

*Signature page follows:*

i-7





**IN WITNESS** whereof the Company and the Contractor have caused this Contract to be signed for and on their behalf by the signatories hereto who have been duly authorized to do so by the Company and the Contractor respectively.

**FOR AND ON BEHALF OF OF THE COMPANY:**

Signature:

Name: MARC PENCAD

Title: EXECUTIVE OFFICER

Date: 24.11.2623

**FOR AND ON BEHALF OF THE CONTRACTOR:**

Signature:

Name: ISMET YUCETAS

Title: Dairector

Date: 24/11/2023